

# FILED

**NOV 0 5 2020**

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ *AMC*
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

*SHAUN SMITH*
(Name of Plaintiff)
*12500 Bruceville Road, X-4101757*
*K58*
(Address of Plaintiff)
*Elk Grove, CA 95757*

vs.

*County of Sacramento;*
*and Scott Jones*

(Names of Defendants)

2:2 0 - CV **2 2 1 9** - ___ CKD PC

(Case Number)

COMPLAINT

### I. Previous Lawsuits:

A. Have you brought any other lawsuits while a prisoner: ☑Yes  ☐ No

B. If your answer to A is yes, how many?: ____|____ Describe the lawsuit in the space below. (If there is more than one lawsuit, describe the additional lawsuits on another piece of paper using the same outline.) *Filed as pre-trial detainee.*

1. Parties to this previous lawsuit:

Plaintiff *Shaun Smith*

Defendants *Alexander Asterlin*

FORM TO BE USED BY A PRISONER IN FILING A COMPLAINT
UNDER THE CIVIL RIGHTS ACT, 42 U.S.C. § 1983          Rev'd 5/99

2. Court (if Federal Court, give name of District; if State Court, give name of County)

_Superior Court of California, County of Sacramento_

3. Docket Number _34-2019-00259680_

4. Name of judge to whom case was assigned _Department 54_

5. Disposition (For example: Was the case dismissed? Was it appealed? Is it still pending?)
_pending_

6. Approximate date of filing lawsuit _2019_

7. Approximate date of disposition _pending_

II. Exhaustion of Administrative Remedies

A. Is there a grievance procedure available at your institution?   ☑ Yes   ☐ No
_Sometimes_

B. Have you filed a grievance concerning the facts relating to this complaint?
   ☑ Yes   ☐ No
   If your answer is no, explain why not _When available._

C. Is the grievance process completed?   ☑ Yes   ☐ No

III. Defendants

(In Item A below, place the full name of the defendant in the first blank, his/her official position in the second blank, and his/her place of employment in the third blank. Use item B for the names, positions and places of employment of any additional defendants.)

A. Defendant _See attachment._ is employed as _____
_____ at _____

B. Additional defendants _____
_____
_____
_____
_____
_____
_____

2

IV.     Statement of Claim

(State here as briefly as possible the facts of your case.  Describe how each defendant is involved, including dates and places.  Do not give any legal arguments or cite any cases or statutes.  Attach extra sheets if necessary.)

_See   attachment._

V.  Relief.

(State briefly exactly what you want the court to do for you.  Make no legal arguments.  Cite no cases or statutes.)

_See   attachment_

Signed this _29th_ day of _October_ , 20 _20_ .

_____
(Signature of Plaintiff)

I declare under penalty of perjury that the foregoing is true and correct.

_October 29, 2020_
(Date)

_____
(Signature of Plaintiff)

## NATURE OF ACTION

1. This action arises out of Defendant's unconstitutional and illegal treatment of Plaintiff during his pre-trial detainment and incarceration in Sacramento County's two jails, Sacramento County Main Jail ("Main Jail") and Rio Cosumnes Correctional Center ("RCCC"). Defendant knowingly has created and perpetuated overcrowded and understaffed jails, subjecting Plaintiff during his pre-trial detainment and post-trial incarceration to dangerous, inhumane, and degrading conditions.

2. Defendant regularly subjected Plaintiff to harsh, prolonged, and undue isolation. Subjecting Plaintiff, during pre-trial detainment to a dark, cramped, and filthy cell for 22 to 24 hours per day. Defendant would not allow Plaintiff any access to sunlight, or outdoor activities for hundreds of days at a time. Plaintiff as a result has been diagnosed with a vitamin D deficiency. Defendant, consistantly for more than one year, prevented Plaintiff from any sunshine. Defendant only provided Plaintiff approximately five hours of fresh air in over a one year period of time. The extreme deprivations and isolation actually caused physical and psychological harm.

3. Defendant's treatment of Plaintiff during his pre-trial detainment as described previously herein has actually caused Plaintiff to become

1. mentally ill. Defendant has failed to provide adequate
2. medical health care, mental health care. Defendant's
3. failure to provide minimally adequate mental
4. health treatment, combined with the deplorable
5. conditions of confinement in the jails has
6. actually caused Plaintiff to mentally suffer,
7. decompose, and want to commit suicide.
8. Prior to the pre-trial detainment herein, Plaintiff
9. did not suffer at all mentally. Prior to his pre-trial
10. detainment Plaintiff had never thought about
11. committing suicide.
12.    4. Since November 2016, at least five
13. individuals have died by suicide while held
14. in Sacramento County Jails. Many more individuals
15. have attempted suicides, resulting in grave
16. injuries as serious as permanent paralysis. The
17. Defendants treatment, deplorable conditions, and
18. deprivations actually caused Plaintiff to suffer so
19. bad that plaintiff on multiple occasions, during his
20. pre-trial detainment, thought about committing
21. suicide to end the suffering.
22.    5. Defendant feeds its inmates meat
23. that is rotten and not able to be consumed;
24. therefore not providing plaintiff a wholesome,
25. nutritionally balanced diet. Defendant is aware
26. that multiple meats it feeds its inmates is not actually
27. consumable and is rotten, but chooses to
28. feed it to Plaintiff, and all other inmates, multiple

1  meals per week, and has done so since Plaintiff
2  has been detained as a pre-trial inmate.
3       6. Defendant does not provide a means to
4  keep their living quarters clean or practice good
5  health habits. Defendant, at the main jail
6  did not regularly provide the necessary grooming
7  equiptment, such as, a razor, trimmer, finger
8  nail clippers, unless an inmate has court
9  scheduled the next day. Defendant does
10  not provide the necessary clothing and linens.
11  The clothing and linens provided are not
12  clean, mildew, smell of sweat or other bodily
13  functions. Defendant does not provide a sheet,
14  and forces inmates to sleep on bare
15  mattresses frequently shared between hundreds's
16  of other inmates. Defendant does not provide
17  a pillow. Defendant only provides one pair of
18  socks, underwear, pants, shirt, and shoes. Defendant
19  provides two blankets.
20       7. Defendant deprives inmates and pre-trial
21  detainees their constitutional right to access the
22  courts. Plaintiff has been prevented by Defendant
23  from effectively representing himself on civil
24  lawsuits. Defendant has prevented Plaintiff from
25  a fair hearing on past and present charges.
26  Defendant intentionally prevents inmates and pre-trial
27  detainees, who face complex issues, including
28  Plaintiff, from a constitutionally acceptable method

to ensure prisoners meaningful access to the Courts.

8. Further, Defendant intentionally prevents inmates and pretrial detainees from pursuing grievances, resulting in Plaintiff being unable to exhaust many administrative remedies. Moreover, Defendant has prevented Plaintiff from having access to governmental County of Sacramento insurance claim forms. Preventing Plaintiff from seeking a government claim prior to filing this action.

9. Defendant through its policies, procedures, and regular practices, prevents inmates, and pre-trial detainees, including Plaintiff, from remedying constitutional violations.

10: Defendant through its policies, procedures, and regular practices subjects inmates, pretrial detainees, and Plaintiff to unreasonable risk of future harm which may result in damage to future health. COVID-19 has resulted in deaths to approximately one million individuals who are medically sensitive because of pre-existing conditions. It is contrary to current standards of decency for anyone to be exposed against his own will to COVID-19. Defendant is deliberately indifferent to Plaintiffs medical needs. Defendant intentionally houses inmates in cells and tiers

Page 4 of

1) Magazine  2) finish  (COVID-19  3)

prisoners to be well within six feet of each other.

11. Defendant has been aware of the constitutionally and legally inadequate care and conditions in its jails for years. Reports from multiple outside agencies and consultants have repeatedly documented chronic overcrowding and understaffing in the jails, major deficiencies in health care, excessive use of isolation, and the denial of rights to pre-trial detainees and inmates.

12. In the last decade, no fewer than a dozen reports have detailed significant deficiencies in the treatment of individuals in the Sacramento County jails. In particular, the treatment of individuals with disabilities. Inspector General reports, Grand Jury reports, and reports completed by subject matter experts retained by the County of Sacramento have repeatedly made clear that the health and wellbeing of people incarcerated in the jails are at serious risk. They have found that conditions are "unlikely to meet constitutional standards" and identified "serious violations" of the rights of people with disabilities.

13. In 2015, after a detailed investigation, Disability Rights California issued a report on conditions in the Sacramento County Jails. The report documented harmful policies, practices, and

conditions that adversely impact prisoners, in particular, prisoners with serious mental illness, medical conditions, and physical, sensory, or mental health disabilities. The report detailed the Jail's inadequate health care system, excessive use of solitary confinement, and violations of federal disability law. Nearly all of the deficiencies identified in the report persist.

14. After the detailed investigation by Disability Rights California in 2015, Defendant thereafter contracted with five nationally recognized subject matter experts to assess conditions in the jails and make recommendations. The experts issued written findings consistent with those of Disability Rights California, condemning the conditions of confinement in the jails, identifying serious risk of psychological and physical harm to people in the jails, and calling for significant and immediate changes to address the deficiencies.

15. Correctional expert Eldon Vail documented dangerous understaffing and inhumane, excessively punitive conditions of confinement. The Vail report concluded that "custody staffing for both jails" operate in a state of near perpetual emergency" on account of chronic understaffing."

16. Psychiatric expert Bruce Gage found
that Defendant fails to provide minimally
adequate mental health care, in part due
to significant understaffing of mental health
professionals. Dr. Gage found that the
conditions for people with mental illness in the
jails are dangerous, noting that "those with
psychotic disorders can be expected to
become more psychotic" and "those who are
depressed, suicidal, or self-destructive are
similarly placed at greater risk of harming
themselves" given the jails conditions and
lack of treatment.

17. Jail suicide prevention expert Lindsay
Hayes identified numerous problems with
Defendant's suicide prevention policies and
practices. He reported that Defendant subjects
individuals on suicide watch to punitive and
"anti-therapeutic" conditions. Mr. Hayes
identified structural hazards in the jails
physical plant that increase the risk that
individuals will die by suicide. He provided
twenty-six recommendations to address
deficiencies in Defendant's system. Meanwhile
the suicide rate in Defendants jails has
increased since Mr. Hayes issued his report,
with at least five suicides occurring between
November 2016 and April 2018. Plaintiff is still

investigating additional suicides between April 2018 and current. However, Plaintiff believes more suicides have occurred since April 2018.

18. Defendant has recently been named in a plethora of civil rights violation actions. Most notably, as it relates to this action, on July 31, 2018 Disability Rights California working in conjunction with the Prison Law Office filed a class action for Defendants unconstitutional and illegal treatment of people incarcerated in its two jails. (See Mays v. County of Sacramento, case number 2:18-CV-02081.)

19. Thereafter, on June 05, 2019 Defendant entered into a remedial plan in Mays v. County of Sacramento to "ensure the provision of constitutional medical and mental health care, to ensure non-descrimination for people with disabilities, and to address the use of restrictive housing in Sacramento County Jails."

20. Defendant has done very little since the Remedial Plan in Mays v. County of Sacramento to make changes as they previously agreed to. Defendant often times manufactures and manipulates documentation (i.e., grievances) to appear as though they are complying, when in fact they are not.

21. Defendant continues its unconstitutional and

1  illegal treatment of People, including Plaintiff.
2  Moreover, Defendant has also began additional
3  constitutional violations which include, but are not limited
4  to hiding names and licensing information of
5  individual employees who violated Plaintiffs
6  constitutional rights. Allowing its lower level employees
7  to implement policies that are not written and
8  are unconstitutional. Depriving inmates, including
9  Plaintiff to publications, which plaintiff is
10  constitutionally entitled to.
11     22. Defendant does not take into consideration,
12  at all, the rights of inmates in its jails.
13  Defendant has for years violated rights
14  of Plaintiff which are protected by the
15  constitution. Defendant as part of its constitutional
16  violations has, and continues to, intentionally prevent
17  Plaintiff from accessing the Court and pursuing
18  grievances. Defendant does not provide basic
19  research and/or material in its "Law Library", and
20  limits unconstitutionally what you may be provided
21  through paging systems, and outdated material. ⑧
22
23               PARTIES
24  PLAINTIFF
25     23. Plaintiff SHAUN SMITH was a pre-
26  trial detainee and is currently a prisoner
27  awaiting transport to the California Department of
28  Corrections and Rehabilitation (CDCR). Plaintiff was

3) This Mandatory Complaint that prisoners must use is outdated
by 17 years. The Sheriff will not provide an updated version.
(See Revised version 03/2016)

1  a pre-trial detainee between the dates April
2  20, 2017 and September 26, 2017. Plaintiff was
3  released on bail from Defendant on September
4  26, 2017. Plaintiff was again placed in
5  the custody of Defendant on April 15, 2020
6  as a pre-trial detainee. Plaintiff was
7  sentenced on August 14, 2020 to serve a
8  total of five (5) years in the custody of
9  the California Department of Corrections and
10 Rehabilitation (CDCR). Plaintiff is currently being
11 held by Defendant for CDCR due to CDCR
12 suspending all intakes of prisoners from
13 Defendant due to COVID-19.
14      24. Plaintiff, during his pre-trial detainment
15 developed serious mental illness and cognitive
16 disabilities. Plaintiff has suffered significant
17 physical and psychological harm for years both
18 awaiting trial and after conviction while being
19 in Defendants custody. Plaintiff has suffered
20 hallucinations, depression, suicidal thoughts, and
21 diagnosed with a Vitamin D deficiency related to
22 the lack of exposure to sunlight. Defendant
23 has failed to provide Plaintiff adequate medical
24 and mental health care.
25 DEFENDANT
26      25. Defendant County of Sacramento ("County"
27 or "Sacramento County" or "Defendant" hereafter) is a
28 public entity, duly organized and existing under

1  the laws of the State of California. Under
2  this authority, Defendant operates and
3  manages two jails: 1) the Main Jail, located in
4  downtown Sacramento, and Rio Cosumnes
5  Correctional Center, located in a rural area of
6  Elk Grove. The County has at all relevant times
7  been responsible for the actions and/or
8  inactions and the policies, procedures, practices,
9  and customs of the Sacramento County
10  Sheriff's Department.
11     26. Defendant Scott Jones ("Defendant
12  Jones") is the Sheriff of Sacramento County.
13  Defendant Jones is named herein in his official
14  capacity, except as to injunctive relief sought
15  by Plaintiff hereinafter, in which case, Defendant
16  Jones is named in his individual capacity.
17     27. Defendants County and Jones are
18  responsible for ensuring that the basic human
19  needs of individuals, including Plaintiff, are
20  met, and for ensuring that Plaintiff is not at
21  risk of serious harm, including by providing
22  appropriate funding, oversight, and corrective
23  action to ensure adequate conditions. Defendant
24  is also responsible for ensuring that jail
25  policies and practices do not violate individuals'
26  substantive and procedural rights.
27  //
28  //

## FACTUAL ALLEGATIONS

### I.   DEFENDANTS KNOWINGLY OPERATES DANGEROUSLY UNDERSTAFFED JAILS

28. Defendants incarcerate far more people than it is able to house safely and humanely in its jails. Together, the two jails incarcerate approximately 3,800 people each day, including both pretrial and sentenced individuals.

29. The large jail population stems from the County's high incarceration rates, particularly of people with mental illness and/or disabilities. In November 2016, an outside consultant hired by Defendant, CGL Management Group, LLC ("CGL"), tied the overcrowding in Defendants jails to the County's incarceration rate because of long lengths of stay in the jail, lack of community diversion programs, lack of transitional and supportive housing for people experiencing homelessness, an unnecessarily harsh bail system and underutilized pretrial release system, and longer-than-average probation terms. Because Defendant fails to provide sufficient community resources to meet the needs of people with mental illness, such as community health services, crisis intervention, and supportive housing, people with mental illness regularly cycle in and out of the jails, contributing

Page 12 of ___

1  to harsh and harmful incarceration.

2     30. In 2015, the Sacramento County Grand

3  Jury reported that the number of people who

4  received a mental health diagnoses at the time

5  of intake at Defendant's jails had nearly

6  doubled since 2009, from 18% to 34%.

7  Defendant has understaffed its mental health

8  program for over a decade, and the program

9  falls further behind as the share of

10  individuals with serious mental health needs

11  in Defendant's custody remains exceedingly

12  high.

13

14     A. Defendant Subjects People in its Custody

15  to Serious Risk of Harm by Failing to Provide

16  Adequate Custody and Health Care Staff

17

18     31. Defendants jails are alarmingly understaffed.

19  Due to Defendants failure to provide adequate

20  resources, the jails maintain dangerously low levels

21  of custody staff and other resources Plaintiff

22  was entitled to by law.

23     32. As a result, Defendant is unable to comply

24  with its own policies, and procedures, as well

25  as correctional practice standards, with respect to

26  supervision, out of cell time and programming,

27  mental health and medical care, and cleanliness.

28  Inadequate staffing at the jails has placed the

Page 13 of ____

safety, security, and health of incarcerated
people, including Plaintiff, at risk.

33. Because of its custody staffing shortages,
Defendant routinely staffs only two deputies
to areas that house as many as 200 people
of differing security factors and needs.
Without sufficient custody staffing to supervise
its population, Defendant simply locks up
hundreds of people inside their cells for 22
to 24 hours every day.

34. Dramatic shortages in medical and mental
health care staffing also put people in the
jails at serious risk of harm. Chronic
shortages in the number of health care
professionals contribute to inadequate intake
procedures and follow up, extreme delays, lapses
in care, an overreliance on nurses acting beyond
their scope of practice, dangerous medication
administration practices, refusal to provide any
indentifying information including licensing
information, and just not responding, at all,
to medical requests.

B. Defendant has Ignored Report after
Report Calling for Significant Increases in
Staffing in the Jails

35. Defendants are aware of the dangerously

low staffing levels because multiple reports, and
class action consent decrees over the last
decade - including Defendants own internal
reports, reports commissioned by Defendant,
and investigations conducted by the Sacramento
County Grand Jury - have repeatedly found that
staffing is inadequate and poses a danger
to inmates.

36. In 2009, the Office of the Inspector
General ("OIG") conducted a jail Operations
Audit for the Sacramento County Jails. The audit
noted that "significant staffing deficiencies"
at Defendants jails had been reported as far
back as 2006, but nonetheless persisted. The OIG
found that understaffing among health care
professionals was jeopardizing the effectiveness of
intake health screening at the jails, with
implications for public health.

37. A year later, the OIG again reported that
Defendants jails were "understaffed by any measure."
The staffing study concluded that "sufficient
staffing to safely and effectively do the job is
rarely, if ever, reached," and that the low staffing
levels compromised safety.

38. In 2011, the Sacramento County Grand Jury
reached the same conclusion. The Grand Jury found
that Defendant County's insufficient deputy staffing
prevented the provision of sufficient out-of-cell time

to people in the jail and contributed to low
staff morale.

39. In January 2015, Health Management
Associates (HMA), a consulting group hired by
Defendant County, found that "[m]ental health
staffing compared to other jails and increasing
service demands and wait times may be placing
the county at risk of poor behavioral health
outcomes!" HMA found that Defendant did not
have sufficient nursing or physician staff to
address chronic care needs of patients, and
lacked a "regular process to collect and evaluate
access to nursing, address bottlenecks or situations
that cause lags, and the subsequent risk."

40. In June 2016, the Sacramento Grand Jury
issued a report describing RCCC as "overcrowded"
and observing that custody staffing levels were
lower than similar-sized facilities. The following
year, the Grand Jury again found staff shortages
were of primary concern.

41. In November 2016, yet another consultant, CGL
reported that Defendants operated the Main Jail with
a staff-to-prisoner ratio that "far exceeds advisable
levels." The CGL report found that "Main Jail
staffing does not meet contemporary standards
for adequate supervision of the inmate population."
CGL concluded that housing unit staffing alone
would have to almost double in order to meet

1  recommended supervision levels.

2      42. Mr. Vail, Defendants expert consultant in

3  correctional practices, recently reported that Defendants

4  jail system was "dangerously understaffed and

5  struggling to meet the minimal requirements of

6  their current policies." He called for a "sizeable

7  increase in both mental health and custody

8  staffing."

9      43. Other experts retained by Defendant County

10 made similar findings. Dr. Austin, Dr. Gage, and

11 Sabot Consulting reported that staffing shortages

12 in Defendants jails undermine the provisions of

13 minimally adequate health care, prevent compliance

14 with and state disability law, and contribute to

15 inhumane conditions of confinement.

16     44. In 2018 a class action for injunctive

17 and declatory relief was filed against Defendant

18 County by class members represented Disability

19 Rights California and Prison Law Office. The

20 Class action alleged most of what is alleged

21 herein (Mays v. Sacramento County, case no. 2:18-cv-02081).

22     45. In 2019, Defendant County entered into a

23 consent decree to "ensure the provision of

24 constitutional medical and mental health care, to

25 ensure non-discrimination for people with disabilities,

26 and to address the use of restrictive housing in

27 the Sacramento County Jails."

28     46. Defendants initially made attempts to hide

Page 17 of ___

1  the required notices of the Mays v. Sacramento
2  County action which were intended to notify
3  class members, including plaintiff. Defendants have
4  done very little, if anything at all, to actually
5  make changes that provide constitutional medical
6  and mental health care, to provide non-discrimination
7  for disabilities, or address the use of restrictive
8  housing in regards to Plaintiff during his
9  pretrial detainment and/or his post-trial
10  incarceration.
11      47. Despite the repeated warnings, class
12  actions and agreements, Defendants County and
13  Jones have failed to increase staffing levels in a
14  meaningful way. Current staffing levels are
15  nowhere close to sufficient to address the
16  risk of substantial harm to Plaintiff during
17  his incarceration in Defendants jail.
18
19      II. DEFENDANT IMPROPERLY SUBJECTS
20  PEOPLE IN THE JAILS TO PROFOUND,
21  PROLONGED, AND HARMFUL ISOLATION
22
23      A. Conditions of Confinement in Defendants
24  Main Jail are Extremely Harsh and Harmful
25
26      48. Defendants, by their policies and practices,
27  lock hundreds of people each day in tiny, dirty,
28  concrete cells for at least 23½ hours per day,

1  with little to no opportunity for human
2  interaction, excercise, or recreation. Plaintiff
3  was subjected to prolonged stays in
4  restrictive housing, simply for excercising
5  his rights to trial and to represent himself.
6    49. According to Defendants policies and
7  practices, Plaintiff was only entitled to
8  three hours of out-of-cell time per seven
9  day period. In practice, during Plaintiffs time
10  in restrictive housing, Defendant failed to
11  ensure even that small amount of out-of-
12  cell time was provided. Often times even
13  while plaintiff was housed in general population,
14  and not in restrictive housing, Defendants failed
15  to allow three hours of out-of-cell time due
16  to training, staff shortages, lockdowns, and/or
17  insufficient space.
18    50. Defendant has created and maintains
19  extremely harsh living environments for
20  Plaintiff. Plaintiff was not allowed any
21  access to sunlight while housed at the main
22  jail. Defendants only allowed Plaintiff a
23  few hours of fresh air in over a year period
24  of time. Defendants allowed Plaintiff limited
25  access to showers, phones, books, religious services,
26  and commissary privileges. Often times Defendant
27  will only offer the ability to change your clothes,
28  cut your hair, shave, and/or cut your toe nails

19

1 in the middle of the night, preventing
2 Plaintiff from receiving clean clothes, and/or
3 groom himself. Defendant also restricts access
4 to grooming supplies to when Plaintiff had a
5 Court appearance.
6    51. Defendant held Plaintiff in
7 extreme conditions for years. The policies
8 and practices at some times resulted in
9 Defendants allowing individuals subjected
10 to disciplinary detention more out of cell
11 time than Plaintiff, who has never been found
12 culpable of any rule violations by Defendants.
13    52. Defendants housing at the main
14 jail subjected Plaintiff to tiny cells, with
15 no fresh air or natural light, no clocks,
16 and no method to track time. Often
17 times Plaintiff did not even have access to
18 a Bible, or a pencil sharpener. Lack of
19 ventilation, and inadequate temperature, and
20 clothing and bedding linen restrictions led to
21 sweltering temperatures in the summers and
22 freezing conditions in the winter at
23 Defendants jails. Defendant at times did
24 not provide plaintiff a mattress, leaving
25 Plaintiff to sleep on hard, cold, dirty
26 floors and concrete slabs for days at a
27 time. When a mattress is finally provided, it
28 is dirty and previously used by many different

20

inmates.

53. Defendants fail to maintain basic cleanliness and sanitation, housing Plaintiff in cells that are covered with feces, black mold, rotten food, garbage, and bugs. The cells lacked windows or visibility to the outside causing isolation, sensory deprivation, and contributing to depression.

54. Defendants place individuals with mental health issues in "turtle suits" which consist of padded blocks, and strip them nude, and place them in the "Classroom", which is a cell made primarily of windows and make a showing of the individual to between 200 to 300 inmates and staff. Defendants practices have caused Plaintiff to not seek mental health medical services for suicide prevention in fear he may be stripped naked, placed in the turtle suit and left to perish in the classroom. Instead, plaintiff has suffered and gone untreated.

B. Defendant Subjects People to Severe Isolation for Illegitimate Reasons and Deny Them Any Meaningful Opportunity to Challenge Their Placements

55. According to Defendants policy and practices,

21

Plaintiff was locked in restrictive housing units even when there is no legitimate penological purpose for doing so. Defendant automatically placed plaintiff in T-Sep housing even though plaintiff was not a high security risk and had no disciplinary actions. Was placed in T-Sep restrictive housing without any reason being provided to plaintiff by Defendants.

56. Defendants housed Plaintiff in punitive and isolated conditions, without adequate mental health treatment. According to its experts, Defendants have failed to implement appropriate criteria or meaningful review for placement in restrictive housing. The Sheriff's Department lacks the staffing and other resources to address this serious deficiency. As a result, Defendant continues to lock up hundreds of people in restrictive housing, including Plaintiff, ——— based on an irrational and highly punitive system. By design, Defendants regularly fail to notify individuals, including Plaintiff, of the reason for their solitary confinement placement, when they will be released, or what they can do to get back to general population housing.

//

//

//

22

## C. Defendant Is Aware of the Harm Caused by its Use of Excessive, Harsh and Prolonged Isolation

57.   Defendants have knowingly created and perpetuated a jail system that relies heavily on excessive isolation, putting people at serious risk of harm or death. The United States Department of Justice defines "solitary confinement" as the "state of being confined to one's cell for approximately 22 hours per day or more, alone or with other prisoners, that limits contact with others." Prolonged solitary confinement is defined as any period of time over three to four weeks. Defendants are aware that individuals are confined to their locked cells for well over 22 hours per day and remain in that setting for periods lasting as long as months and years. In Plaintiff's case at hand, it was over one year.

58. Mental health and correctional experts have documented the harmful effects of harmful effects of prolonged solitary confinement. Common side effects of prolonged solitary confinement include anxiety, panic, withdrawl, hallucinations, self-mutilation, and suicidal thoughts and behaviors. Davis v. Ayala, 135 S. Ct.

23

2187, 2210 (2015) (Kennedy, J. concurring)(citing Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash. U. J. L. & Pol'y 325 (2006)). Prisoners punished with solitary confinement may be up to seven times as likely to commit acts of self-harm. Upon information and belief, a disproportionate number of the suicides and suicide attempts inside Defendant's jails occur in solitary confinement units. Plaintiff was consistently in solitary confinement units in Defendants' Main Jail for over one year. During this time, plaintiff had severe anxiety, panic, withdrawal, hallucinations, and suicidal thoughts and behaviors.

59. Defendants policies and practices of subjecting Plaintiff to severe isolation and idleness and caused Plaintiff serious psychological harm, including cardiovascular problems, migraines, profound fatigue, deteriorating eyesight, back and feet pain, and aggravation of preexisting conditions. The physiological consequences are both physical manifestations of the psychological effects of isolation and the result of long periods of extreme inactivity, lack of natural light, and lack of fresh air.

60. Defendants are aware of the severe harm that prolonged and harsh isolation causes

24

1  because individuals in the jail regularly complain to
2  staff members, including plaintiff, orally and in
3  writing, about the conditions of restrictive housing
4  units and the damaging impact on their physical
5  and mental health.
6     61. Defendants have been placed on notice of the
7  impact of its restrictive housing practices by multiple
8  written reports. Disability Rights of California's
9  report documented the danger of overuse of
10 restrictive housing in harsh conditions, including
11 extreme isolation, minimal out-of-cell time,
12 few opportunities for exercise or recreation, and
13 inadequate monitoring of and care for people
14 with mental health needs in restrictive housing.
15    62. In June 2016, Mr. Vail found that Defendant
16 County "overuses segregation for both mentally ill and
17 the non-mentally ill," and the conditions in
18 Defendant County's restrictive housing units are
19 "very stark and unlikely to meet constitutional
20 standards."
21    63. In November, 2016 CGL found that "the amount
22 of out of cell time and recreation time provided to
23 inmates in the Main Jail is insufficient... due
24 at least in part to the lack of correctional
25 staff available to adequately supervise inmates
26 out of their cells."
27    64. In May 2017, Austin, et al. reported that
28 Defendant County places individuals, including those

with mental illness, in "harsh conditions of solitary confinement ... for excessive periods of time," and that there is no "credible or transparent process" by which individuals are assigned to or removed from restrictive housing.

65. Despite knowledge of its overuse of solitary confinement and the harmful effects thereof, Defendants continue to rely on profound and prolonged restrictive housing. To this day, hundreds of individuals are still subjected to dangerous and inhumane conditions in restrictive housing units. Similarly, Defendants have failed to address systemic deficiencies in its disciplinary process or the degrading conditions of confinement for individuals in Restrictive housing. Even after Defendant County entered into a stipulated agreement in class action litigation to do such.

## III. DEFENDANT FAILS TO PROVIDE MINIMALLY ADEQUATE MENTAL HEALTH CARE IN ITS JAILS

66. Defendants have a policy and practice of failing to provide sufficient mental health care to more than 1500 individuals with mental health needs in the jails. Many of those individuals, including Plaintiff, suffer from severe mental illness and experience symptoms such as paranoia, auditory

1  and visual hallucinations, and persistent thoughts
2  of self-harm.
3      67. Defendants mental health system is defined
4  by severe staffing shortages, an inadequate
5  screening and assessment process, significant delays
6  in access to clinicians and medications, a scarcity
7  of treatment and services, inadequate treatment
8  space, no privacy, and an overreliance on harsh,
9  restrictive housing units. Defendants system of care
10 is wholly inadequate to meet the significant and
11 growing mental health needs of its population. The
12 mental health system of care in place has actually
13 failed Plaintiff.
14
15     A. Defendant fails to Identify or Respond Timely
16 to the Mental Health Needs of Individuals in the
17 Jails.
18
19     68. Defendants lack a system for triaging and
20 following up timely for regular and necessary follow up
21 appointments, or urgent time sensitive requests by plaintiff.
22 Plaintiff disclosed to mental health staff actual
23 suicide ideations. Not only did staff thereafter
24 not follow up in a timely manner, staff left
25 Plaintiff to suffer without treatment.
26     69. Defendants system of care is so deficient,
27 that when you are actually seen by staff for a
28 mental health request, the staff work only at confirming

1 | whether or not you are actively in danger of
2 | harming yourself or others, or are in danger of being
3 | harmed by others. These triages are in common
4 | areas, often times with staff or other inmates
5 | nearby and no privacy. There is never any
6 | actual therapy, or treatment to explore what may
7 | be causing the mental illness. On information and
8 | belief, this is because to treat or document the
9 | cause of Plaintiff's mental illness would admit
10 | culpability of Defendants and inhumane treatment of
11 | Plaintiff while confined Defendants jails.
12 |
13 | B. Defendants Fail to Provide Minimally
14 | Adequate Mental Health Treatment
15 |
16 | 70. During the time Plaintiff has been in Defendants
17 | jails, Defendants have provided the most rudimentary
18 | mental health care: basic assessment, psychotropic
19 | medication management, and crisis response. While
20 | Defendants have failed at said rudimentary services,
21 | Defendants do not offer, or provide adequate treatment
22 | planning, and it does not offer adequate individual
23 | or group therapy, structured activities, or rehabilitative
24 | services. Defendants experts have found that when
25 | mental health care staff respond to request for care,
26 | such visits can be as short as 15-30 seconds.
27 | In Plaintiffs case, a majority of the appointments
28 | were a few minutes. Most of which

1  was spent by mental health staff manipulating
2  what Plaintiff was saying to look better for their
3  Defendants documentation.
4  71. Defendants failed to provide confidentiality for
5  mental health contacts. Instead, clinicians met with
6  Plaintiff in heavily trafficked areas. This practice
7  completely eliminated Plaintiff's privacy and
8  interfered with the provision of health care services.
9  Plaintiff was forced to not share important
10  information with health care staff because of this
11  practice and policy.
12  72. Defendants maintain a haphazard and
13  dangerous medication distribution system. Due to
14  insufficient staffing, psychiatric prescribers
15  frequently start or change individuals' medications
16  without even seeing the patients, including Plaintiff,
17  or providing any follow up to monitor side effects
18  and medication efficacy. Psychotropic medications
19  are distributed to patients at inconsistent and
20  odd hours of the day, sometimes in the middle of
21  the night. Sometimes Defendants completely forgot
22  about Plaintiff and his medication.
23  73. Defendant's dangerous practices leave many
24  people with mental illness either improperly, overly or
25  underly medicated. One woman received such an
26  inappropriately high dosage of her medication that
27  she lost consciousness.
28  //

## IV. DEFENDANT FAILS TO TAKE BASIC MEASURES TO PREVENT SUICIDE

74. Defendants fail to take basic measures to prevent suicide in the jails. Defendants policies procedures and actual practices fail to identify during intake, provide insufficient support to Plaintiff who has not actually expressed suicidal ideation, and treat individuals in a punitive manner that either discourages reporting of suicidality and increases the risk that suicide attempts will occur. As a result, Plaintiff was prevented from receiving treatment by Defendants. Additionally, individuals are dying by suicide at an alarmingly high rate in Defendants' jails.

75. Defendants failed to provide sufficient supervision of Plaintiff who was actually suffering from thoughts of suicide. Defendants fail to properly train staff about suicide risks and prevention. Defendants also fail to properly supervise staff to ensure proper suicide prevention is taking place. Defendants training for custody staff fails to adequately address how to handle suicidal individuals and does not mention basic crisis intervention strategies.

76. Defendant grossly mistreats people who are identified as suicidal. Defendants policies and practices are unnecessarily and inappropriately punitive, relying on excessive isolation and deprivation,

1 which can be even harsher than the conditions experienced
2 by people facing disciplinary sanctions.
3     77.  When a person is identified as suicidal,
4 Defendants strip him or her of clothes, removes
5 the person from his or her cell, and places him or
6 her in temporary housing without any personal belongings
7 and no access to phones or visitation with family.
8 If a person is unwilling to remove their clothes,
9 deputies forcibly remove it by ripping or cutting it off
10 with scissors.
11     78. Defendants routinely place people who are
12 actively suicidal in barren "safety cells" or a
13 "classroom" while they await psychiatric attention.
14 Deputies often times mock, provoke, tease, and
15 abuse these individuals. Classrooms, also known
16 as multi-purpose rooms, are located in the center
17 of housing pods and enclosed in windows, leaving
18 people exposed to the gazes of pods of other
19 inmates, and staff during a mental health crisis.
20 Defendants confine these people who are suicidal in
21 these harsh conditions around the clock for extended
22 periods of time while they await psychiatric
23 assessment. These placements have no beds,
24 mattresses, toilets, or sinks, and are ill-equipped
25 to house anyone on an extended basis, let alone
26 a person who is actively suicidal. Plaintiff has
27 witnessed individuals placed on suicide watch in
28 the classroom begging deputies to use the restroom.

Plaintiff also witnessed deputies laughing at
the inmate and then ignore him. This individual
thereafter defecate feces and urine all around the
classroom and on himself due to restraints.

79. Defendants own experts have found that
Defendants rely excessively on "safety suits", which
are garments designed to prevent the person from
using the fabric as a noose or to otherwise
commit suicide. Inmates commonly refer to the
"safety suits" in a stigmatizing way as "the Turtle
suit". Safety suits are heavy, bulky, uncomfortable,
and stigmatizing. Defendants use safety suits
indiscriminately and for excessively long periods of
time, in some cases several months. In addition,
Defendants forces all the people that Plaintiff has
seen to wear safety suits with no other clothing,
including underwear, a degrading and punitive practice
which has been documented to have occurred,
even after an individual is no longer suicidal, or
was not suicidal in the first place.

80. Research indicates that these types of
punitive responses to suicidality makes incarcerated
people reluctant to discuss their suicidal thoughts
because of the harsh conditions they will face
on suicide precautions. In fact, the practices and
policies of Defendants prevented Plaintiff from
disclosing suicidal thoughts and ideas. Defendants
policies and practices caused further decompensation

## V. DEFENDANT FAILS TO PROVIDE MINIMALLY ADEQUATE MEDICAL CARE

81. Defendants provide grossly deficient medical to individuals in custody in the jails. Defendants medical care system is plagued with inadequate staffing, an inefficient and incomplete intake process, excessive delays in responding to request for care and providing treatment, if any, an incoherent system for tracking and treating chronic care conditions or providing specialty care, and lack of basic privacy protections. Defendant has failed to commit the resources necessary to remedy these widespread and obvious problems.

### A. Defendants Fail to Identify and Track the Medical Needs of People in its Custody or to Ensure the Timely Provision of Necessary Medical Care

82. Defendants intake system is inadequate to identify individuals' serious medical needs and to ensure the provision of adequate care. Defendants experts have found that the intake screening process is confusing, unwieldy, and fails to cover critically important topics. Nurses, medical assistants fail to ask all questions on the intake

form or to consult available medical records that
contain critical health information. Nurses conduct
intake assessments in the noisy and crowded
booking and intake area, with officers and staffing
standing there and monitoring anything you say.
Plaintiff's privacy is severely violated and
compromised.

83. Defendant's practice for verifying and
distributing Plaintiff's medications, as well as
requesting medical records from community health
providers are disorganized, haphazard, ineffective,
resulting in severe pain, disruptions in care,
heart attacks, long term permanent damage to
the body, dangerous disruptions in care, and
much more.

84. Defendant's system for handling health
services requests ("HSR" or "Medical Kites") is
inefficient and ineffective, forcing Plaintiff with
serious medical needs to languish without care
in his cell and barracks for excessive periods of
time. Although Defendants own policy requires
that nurses make contact with an individual
within 24 hours of receiving a Medical Kite,
Plaintiff has routinely waited days, weeks, and
months before he received responses to his requests.
Plaintiff while in the Main Jail lacked access to
medical kites and grievances, and generally must
submit medical care requests through custody staff,

1  a practice that compromises Plaintiff's confidentiality,
2  discourages reporting of medical needs, and
3  furthers abuse and harassment by staff. In fact,
4  the rulebook and written policies allow inmates to
5  aquire, fill out, and turn in Medical Kites during
6  pill call to the Medical Staff. However at
7  the main jail Plaintiff was not allowed out of
8  his cell during pill call to acquire, or turn
9  in medical kites.
10  85. Defendants have a "one problem per visit"
11  policy, whereby nurses and providers refuse to see
12  patients for more than one medical issue at a time.
13  In other words, if a patient requires care for
14  multiple (and even related) medical issues, he or
15  she must submit multiple requests and wait for
16  multiple appointments to address needs. This
17  system is innettective for addressing co-morbities
18  that require coordinated care.
19  86. Because Defendant has failed to
20  adequately staff medical care positions with
21  staff who actually provide care. It has been
22  impossible for plaintiff to see a doctor when
23  he actually needs care. Instead, Defendant
24  relies excessively on nurses, who are often
25  acting outside of their scope of practice and
26  without nursing protocols to inform their practices.
27  Such a system has lead to delays and mistakes
28  in diagnoses and treatment, causing plaintiff

severe disabilities which could have easily been corrected and/or prevented with very basic medical care. Defendants have caused serious harm and continue to place Plaintiff in serious risk of harm.

B. Defendants Have an Ineffective, Ad Hoc System for Chronic and Specialty Care

87. Defendants lack an adequate system for providing regular care to patients with chronic conditions. Defendants also fail to provide timely and appropriate specialty care, such as oncology, urology, ophthalmology, podiatry and other common and reasonable specialty care. Defendants system for providing specialty care is non-existent, disorganized, with no effective mechanism for tracking and following up on specialty care requests from medical staff, or prior diagnoses. Defendants fail to provide sufficient guidance to medical staff about when specialty care is appropriate.

88. Defendants have denied, and continue to deny Plaintiff access to urgently needed specialty care.

89. Defendants provide inadequate dental care and generally limit dental treatment to emergency situations. Defendants have failed to commit the resources necessary to provide routine or basic dental

care. Defendants restrict access to toothbrushes and toothpaste ——— and floss in the jails, creating and exacerbating dental problems.

90. Plaintiff has had to wait months to receive dental care. Plaintiff has been left in severe pain. At one time, Plaintiff suffered from multiple cavities that were extremely painful. Plaintiff could not chew, at all, due to the pain. Defendant would only work on one filling at a time for months.

C. Defendants Use Deficient Medical Treatment Spaces and Fail to Ensure Continuity of Care

91. Defendants examine and treat patients in highly public areas that have no visual and auditory privacy, and do not contain basic equipment such as exam tables and sinks. In the Medical Housing Unit (MHU) at RCCC, Plaintiff has had multiple medical appointments where Plaintiff is surrounded by inmates and deputies.

92. Defendants lack a functioning system for prescription and distribution of medication. Medical Staff create policies and practices that are against the inmate hand book and cause Plaintiff to not successfully take his blood pressure medication.

## D. Defendants are Deliberately Indifferent to the Harm Caused by Its Deficient Medical Care Practices

93. Defendants have been placed on notice for years about inadequate medical care. In 2009 and 2010 the OIG reported on significant cuts to the Correctional Health Services operating budget. The OIG found that budget cuts "had a profound effect on medical care services in the jail facilities," and that "service levels have been severely compromised." The cuts made resulted in a major reduction of health care staff. According to the OIG, the cuts resulted in significant treatment delays and compromised access to care, "unprecedented reductions" in the Correctional Health Services operating budget. In particular, the OIG found that the lack of nurses in the housing units "severely threaten[ed] [the jail's] ability to respond to emergencies."

94. In January 2015, Defendants consultant, HMA characterized jail health care staff as "maxed out". HMA faulted Defendants for staffing an inadequate number of nurses to serve the jail population, noting that Sacramento is an outlier in its inmate-to-nurse ratio. HMA found that Defendant County was "exposing [itself] to significant clinical risk" by understaffing nurses and relying on

temporary and agency staff nurses. The HMA report
stated: "Merely providing a nurse - rather than a
competency-tested, well-prepared correctional nurse - is
not enough to mitigate [the County's] risk for adverse
clinical out outcomes, incorrect processes and
procedures, and threats to staff and inmate
safety.

95. Disability Rights California reported that
"the medical staff at RCCC conceded that they
'struggle' to provide care for chronic conditions
and plan to develop policies for long-term management
of conditions such as asthma, diabetes, hypertension,
and hyperlipidemia."

96. More recently, Defendants expert, Sabot
Consulting, reached many of the same conclusions
about deficiencies in medical care provided to
people in jail. Sabot reported on problems with
medication continuity, including delays in the
provision of medications after booking and
changes to medications that caused serious
side effects.

97. Sabot also reported on delays in
responding to requests for medical care. According
to Sabot, "medical staff cited a backlog ...
in large part due to staffing vacancies across all
disciplines. They acknowledged that this ultimately
adversely affects the health care process."

98. Sabot further reported on Defendants

pervasive failure to ensure confidentiality in medical encounters, noting that "health care staff talk with inmates at cell doors, inside pods, [and] inside rec/dayroom areas with inmates in the areas."

99. Despite these alarming findings, Defendant has made virtually no changes to meaningfully enhance health care staffing, ensure confidentiality of medical encounters, or provide chronic and specialty care.

100. Defendants inadequate medical care system places all people in the jails, and especially people with disabilities, at serious risk of harm or death.

101. When Plaintiff has attempted discuss specific vital confidential information with medical staff, deputies have interferred, taken over the appointments, given medical advice, threatened Plaintiff with discipline, and direct medical staff how to perform medical tasks.

## VI. DEFENDANTS HAVE IMPLEMENTED OVERLYBROAD POLICIES RELATING TO PUBLICATIONS AND RECEIVING MAIL

102. Plaintiff has received many issues of Butte Magazine and Latina by Butte Magazine directly from the publisher. The publisher who

creates these publications focues on providing
pictures of women who are fully clothed, in
swimsuits and lingerie.

103. The same publisher also creates a
publication called Ebony by Butts. On June 25,
2020, Plaintiff received a 'Mail Rejection' Notification'
dated June 24, 2020, issued by Defendants rejecting
a Ebony by Buttz publication that complied with the polices and
procedures in the inmate handbook.

104. Lower level employees of Defendants are allowed
such a wide range of discretion, with no oversite to
ensure that policies and procedures are being complied
with. This has resulted in Defendants broadly
intruding on Plaintiffs constitutional rights —
— by rejecting a mailed publication that
Plaintiff was entitled to.

105. Defendants allow Plaintiff to receive
Caucasion magazines, Latina Magazines, by the
same publisher, but not a African-American Magazine
with the same publishing standards.

VII. DEFENDANTS PREVENT INMATES
FROM ACCESSING THE COURT, GRIEVANCES,
GOVERNMENT CLAIM FORMS, DEFENDING HIMSELF

106. Defendants do not allow inmates, including
Plaintiff, the ability to file grievances and
pursue civil rights violations in courts. Defendants

do not assist inmates in the preparation and
filing of meaningful legal papers by providing
adequate law libraries or adequate assistance
from persons trained in the law.

107. Plaintiff does not have the ability to
file legal claims, or effectively participate in
previously filed legal claims.

108. Defendants do not allow more than 25
pages of copies per week. Defendants do not
allow access to California Judicial Council Forms
which are often mandatory. Defendants operate
a paging system to obtain statutes and case
authorities. Defendants have been preventing plaintiff from
challenging conditions of his confinement. Plaintiff
has only been allotted 2 hours per month (average)
in front of a touch screen kiosk computer with
Software provided by LexisNexis. Plaintiff is not
allowed to print from the kiosk, but may ask
for whatever will fit on an inmate kite. (See
Exhibit A for example.) Defendants will not
provide any paged requests that exceed 25 pages,
and Plaintiff may only submit one request
per week. paged requests often don't fit on the kite.

109. Plaintiff has suffered an actual
injuries as a result of the access issues alleged
herein. Plaintiff has prepared multiple lawsuits
and not been able to file said lawsuits because
he is indigent and does not have access to

42

necessary forms, legal research, copies, mailing supplies, postage, paper, pencils, erasers, pens, pencil sharpener, and other reasonably necessary items.

110. Plaintiff has been unable to present claims to Defendant County as a result of the policies and procedures. Plaintiff cannot actually make the necessary copies to file this complaint as it exceeds 25 pages. Plaintiff cannot access federal forms for filing bankruptcy, or filing taxes, or filing this complaint.

111. Plaintiff has multiple pending Civil and Family Law matters that he cannot participate in. as a result of Defendants policies and procedures related to Plaintiff being deprived access to the court.

112. Plaintiff has been prevented by Defendants from pursuing an effective petition for Writ of Habeas Corpus, challenging conditions of his confinement, and participating in criminal charges against him.

A. Defendant's Operate a Paging System.

113. Defendants paging system (Exhibit A) prevents Plaintiff from participating in pending litigation. Plaintiff cannot conduct the necessary research to address issues relating to "the" actual

43

innocence element" in an unlimited Civil Action.
Additionally, Plaintiff is prevented by Defendants
from performing the necessary research, or accessing
the higher courts through a petition for writ, or
an appeal as a result of Defendants policies
and procedures relating to said pending litigation.

114. Plaintiff has attempted many times to
secure the necessary time on the kiosk to
research the laws which relate to the "actual
innocence element", but has been denied access to
the time requested. Plaintiff has requested the
ability to print at the kiosk, but Defendants have
denied this request. The only option is through
the paging system (Exhibit A). This system has
resulted in Plaintiff receiving only one or two
statutes at a time, and/or one or two published
opinions at a time (Per week). Defendants have taken
up to one month to respond to kites requesting
statutes or published opinions, if they respond at all.

115. Plaintiff has been prevented from performing
the reasonably necessary research at the kiosk to
pursue and defend other civil actions. One example, a
Judgment in one civil matter was entered against
Plaintiff in San Mateo County Superior Court because
Plaintiff was unable to participate in said proceedings
as a result of Defendants paging system.

116. Another example, Plaintiff has been unable
to file a Civil Action against Russell Miller individually

for fraudulent actions Russell Miller made while
representing Plaintiff in his pending criminal matter.
Defendants provide no access to sample pleadings,
California Judicial Council Forms, pleading requirements,
published opinions, statutes, local rules, California
Rules of Court, through its paging system. While
attending the kiosk, Defendants make nothing
available to print. Often times the paged requests
that are returned are cut off at 25 pages,
making it impossible to aquire or read published
opinions, annotations, statutes, or other research
material provided by Defendants on the kiosk.

117. Plaintiff has been prevented by Defendants
from accessing federal forms, United States Code,
federal puplished opinions, and much more.

B. Defendants Do Not Provide Necessary
Supplies or Postage

118. Defendants will not provide supplies
(i.e., envelopes, boxes, tape, etc...) to mail documents to
Plaintiff's court appointed attorney relating to current
charges against him relating to his confinement.
The United States Postal Service provides most of
these supplies for free on its website (USPS.com).
Plaintiff has had supplies sent in by his attorney
to mail necessary documents back to his attorney.
Defendants have taken the supplies, including postage

1  away from Plaintiff. Defendants limit the supplies
2  available for purchase on its commissary system
3  to 8.5"x 11" envelopes and "letter" size envelopes.
4  Defendants will not make any exceptions to
5  the supplies it offers Plaintiff.
6      119. Plaintiff has been indigent during his
7  incarceration by Defendants. Plaintiff is facing
8  charges against him in a case that is complex.
9  The matter involves 20,000+ pages of discovery,
10 hundreds, maybe thousands of transcript pages, motions
11 regarding novel legal issues, many pre-trial petitions
12 for writs of Habeas Corpus, Mandate, and Prohibition.
13 Defendant County and the Superior Court have
14 previously deprived Plaintiff from accessing the
15 court and representing himself. (See Exhibit R.).
16 Defendants have prevented Plaintiff from corresponding
17 with and providing necessary documents to his
18 attorney.
19     120. Plaintiff currently has 3,000 to 5,000
20 pages of documents to mail to his appellate attorney.
21 These documents fill a bankers box. Plaintiff is
22 unable to purchase the necessary supplies and
23 postage on commissary from Defendants. Defendants
24 will not provide, for free or charge, the necessary
25 supplies and postage so plaintiff can mail
26 the documents to his attorney. Defendants regularly
27 rejects _____ postage and mailing supplies
28 mailed in by his attorney and family.

121. Defendants are aware that Plaintiff needs to mail a bankers box full of documents to his appellate attorney in Long Beach, California. Defendants have suggested Plaintiff purchase a few hundred 8.5" x 11" envelopes and postage from commissary. This is not a realistic solution, especially when Plaintiff is indigent, and Plaintiff is limited to two books of stamps per week, and commissary will not allow you to purchase that many envelopes even if Plaintiff had the money to do so.

122. Plaintiff has previously been prevented from providing adequate records in support of Petitions for Writs filed in courts as a result of the supplies and postage policies and practices by Defendants. Plaintiff is currently being prevented from filing necessary writs and other actions due to the policies and practices relating to mail and postage by Defendants.

123. Plaintiff will be precluded from participating in any action which requires more than 2 books of stamps and a 8½" x 11" envelope.

C. Defendants Do Not Provide Access to Mandatory and Optional California Judicial Council Approved Forms, or Any Other Forms

124. California in many areas of its state court system require certain forms be filed to initiate and/

or otherwise parcipate in a court proceeding. This is true at all levels of the state court system. (ie., Superior Court, Court of Appeal, Supreme Court). This is required in Unlawful Detainers, Child Custody Proceedings, Guardianships, Small Claims, limited and unlimited civil actions, and much more.

125. Defendants do not allow access to Statewide California Judicial Council Forms, or any local forms that are generally required in court proceedings.

126. Plaintiff has been unable to pursue and defend multiple court actions and has suffered actual injury as a result.

127. Further, the federal court system also in many different areas require certain forms. Defendants simply do not provide access, even upon verbal and written request.

128. Defendants also do not provide access to administrative policies or procedures relating to the California Department of Corrections and Rehabilitation ("CDCR"), or administrative forms for CDCR. Plaintiff, was admitted to CDCR on August 14, 2020 and assigned a CDCR prisoner number of BM1062. Defendants are receiving compensation from CDCR to house CDCR prisoners.

129. Plaintiff has been unable to obtain the proper forms, policies, procedures, sample pleadings, templates necessary for this federal action.

D. Defendants Prevented Plaintiff from Seeking Redress of Grievances as Well as Meaningful Access to the Courts

130. Defendants policies and procedures force inmates when requesting a Grievance Form to physically face their accuser and request a Grievance Form. You are forced to tell Defendants why you want the Grievance Form and what you are grieving before Defendants will provide you a Grievance Form. Often times, Defendants will threaten to "hit your house".[4] Implying they will retaliate against Plaintiff for seeking Redress of grievances against Defendants.

131. At other times Defendant will tell you that your issue is not grievable, or just flat out refuse to provide plaintiff a Grievance Form to redress his Grievances.

132. As part of the Grievance process that Defendants policies and procedures require when Plaintiff is not satisfied with a response to a Grievance Form, Plaintiff must thereafter file a Commander's Appeal to the initial grievance. Defendants however do not offer a form and/or template that Plaintiff can prepare. Further Defendants force Plaintiff to mail any Commander Appeals to the same address as where Plaintiff is housed.

133. Defendants have also prevented Plaintiff from

4) "hitting a house" means searching your cell.

1 | seeking a govermental claim with the County
2 | of Sacramento.

3 |
4 |    VIII.  DEFENDANTS DEPRIVED PLAINTIFF
5 | OF OUTDOOR EXERCISE

6 |
7 |    134.  Defendants confined Plaintiff to his
8 | cell and allowed approximately five to ten hours
9 | of outdoor exercise in over one year while Plaintiff
10 | was housed at the main jail.

11 |
12 |    X.  DEFENDANTS FORCE PLAINTIFF
13 | TO A LIVING ENVIORMENT THAT
14 | UNREASONABLY ENDANGERS PLAINTIFF'S HEALTH

15 |
16 |    135.  Defendants are aware that Plaintiff has
17 | pre-existing medical conditions that render Plaintiff
18 | vulnerable to death if he contracts Corona virus.
19 |    136.  On information and belief, Defendants
20 | are indifferent to Plaintiffs medical needs and
21 | houses Plaintiff in its jails where it is impossible
22 | to socially distance. Defendants staff do not socially
23 | distance from Plaintiff and do not respect local
24 | and state government mandates in regards to
25 | Corona virus.
26 |    137.  Defendants house inmates in pods and
27 | dorms that are so overcrouded that makes
28 | social distancing impossible,

## XI. DEFENDANTS TREAT PRE-TRIAL DETAINEES WORSE THAN SENTENCED INMATES

138. During the time periods in which Defendants housed Plaintiff as a pre-trial detainee, they intentionally housed Plaintiff in "high security housing". When Plaintiff exercised his right to trial in his pending criminal matter, Defendants moved him to highly restrictive lockdown in cell living.

139. It is standard policy that inmates who are sentenced receive more comfortable clothing, the inmate then is moved to the "honor side" of the facility. At the honor side you are given access to a bigger yard, more outside time.

140. Once Plaintiff was sentenced, Defendants moved him to a barracks with substantially more privileges.

## CLAIMS FOR RELIEF
## FIRST CAUSE OF ACTION
## (Eight Amendment - Cruel and Unusual Punishment)
## 42 U.S.C. § 1983

141. Plaintiff incorporates by reference each and every allegation contained in the above paragraphs as if set forth fully herein.

142. By the policies and practices described herein, Defendants subject Plaintiff to a substantial risk of serious harm and injury from inadequate medical and mental healthcare, and deprive Plaintiff of the minimal measure of life's necessities and human dignity through the excessive and inappropriate use of solitary confinement and other restrictive placements.

143. Defendants are deliberately indifferent to corona virus and the requirements for sanitation and social distancing as it relates to Plaintiff. Defendants policies and practices as described herein, subject Plaintiff to a substantial risk of serious harm and injury from corona virus.

144. Defendants are deliberately indifferent to providing plaintiff adequate clothing, proper ventilation, personal hygiene supplies, bedding and linens, as it relates to Plaintiff.

145. These policies and practices have and continue to be implemented by Defendants and agents, officials, employees, and all persons acting in concert under color of state law, in their capacity for Defendants, and are the proximate cause of Plaintiff's ongoing deprivation of rights secured under the Eighth Amendment.

146. Defendants have been aware of all the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct. It should be obvious to Defendants and to any

1  reasonable person that the conditions imposed on
2  Plaintiff for many months, and is some
3  deprivations multiple years, cause tremendous mental
4  anguish, suffering, and pain to Plaintiff. Moreover,
5  Defendants have been made aware, through
6  administrative grievances and written complaints,
7  that plaintiff is currently experiencing, or is at
8  risk of, significant and lasting injury.
9
10            SECOND CAUSE OF ACTION
11  ( Fourteenth Amendment - Cruel and Unusual Conditions)
12            42 U.S.C. § 1983
13
14      147. Plaintiff incorporates by reference each and
15  every allegation contained in the above paragraphs as
16  it set forth fully herein.
17      148. By the policies and practices described herein,
18  Defendants subjects Plaintiff to a substantial risk
19  of serious harm and injury from inadequate
20  medical, mental health care, sanitation, social
21  distancing, overcrowding, adequate clothing, proper
22  ventilation, personal hygiene supplies, bedding and
23  linens, fresh air, and deprived Plaintiff of the
24  minimal civilized measure of life's necessities and
25  human dignity through the excessive and inappropriate
26  use of solitary confinement and other restrictive
27  placements, thus violating Plaintiff's rights to
28  due process under the Fourteenth Amendment

to the United States Constitution.

149. Defendants further deprived Plaintiff of his Fourteenth Amendment constitutional rights by depriving Plaintiff of his ability to access the courts, challenge conditions of his confinement, attack and/or challenge his charges in criminal court, seek redress of grievances against Defendants, representing himself in criminal proceedings, file a effective Petition for Habeas Corpus, and/or a Civil Rights Federal action, as well as other deprivations previously alleged herein.

150. The policies and practices have been and continue to be implemented by Defendants and its agents, officials, employees, and all persons acting in concert under color of state law, in their official capacity, and are the proximate cause of Plaintiff's ongoing deprivation of rights of rights secured under the Fourteenth Amendment.

151. Defendants are aware, and have been aware of all of the deprivations complained of herein, and have condoned or been deliberately indifferent to such conduct. It should be obvious to Defendants and to any reasonable person that the conditions imposed on Plaintiff for many months, and multiple years, cause tremendous mental anguish, suffering, actual monetary damage, and pain to Plaintiff.

152. In addition, Defendants violated the

1 Fourteenth Amendment due process rights of Plaintiff
2 when he was awaiting trial, and thus was not
3 convicted of a crime, on the basis that the conditions
4 of confinement amounted to punishment, or
5 alternatively, that Defendants made an intentional
6 decision with respect to allegations previously alleged
7 herein. Defendants failed to take reasonable
8 available measures to abate those risks, even though
9 a reasonable actor in the circumstances would have
10 appreciated the degree of risk involved.
11
12                THIRD CAUSE OF ACTION
13   (Fourteenth Amendment - Procedural Due Process)
14                42 U.S.C. § 1983
15
16       153. Plaintiff incorporates by reference each and
17 every allegation contained in the above paragraphs
18 as if set forth fully herein.
19       154. Defendants policy and practices of using
20 indefinite and prolonged restrictive housing and
21 restrictive placements, paging systems as it relates
22 to law library access, accessing grievance forms, and
23 other allegations made previously herein, subject Plaintiff
24 to a significant deprivation of liberty without any
25 procedural safeguards. Plaintiff had a liberty interest
26 in not being confined in a restrictive housing unit.
27 Plaintiff also had a liberty interest in accessing the
28 courts, receiving publications, challenging conditions of

Page 55 of _____

confinement, and other liberty issues previously addressed herein. Plaintiff has a liberty interest in not being denied said liberty interests unless it is necessary to ensure the safety and security of staff and other individuals.

155. The conditions and duration of Defendants placement of Plaintiff constitutes an atypical and significant hardship as compared with the ordinary incidents of jail life because of the harsh and isolated conditions and the lengthy duration of confinement in those conditions. Plaintiff as compared to other individuals similarly situated was housed in conditions which prevented access to social interaction, environmental stimulation, programs and activities, physical exercise, personal property, interacting and communicating with his attorneys' and other legal assistants, hygiene products, sunlight, and fresh air.

156. Because prolonged placement in restrictive housing and other restrictive placements constitute a significant and atypical hardship, by the policies and practices described herein, Defendants have deprived Plaintiff of a liberty interest without due process of law by denying him: (1) a hearing with advance written notice before initial placement, (2) the opportunity to present witnesses and documentary evidence, (3) written reasons for the decision, (4) counsel substitute for complex issues, and (5) meaningful and timely periodic review of Plaintiff's continued long-term

1  and indefinite detention in restrictive housing and
2  other restrictive placements, and meaningful notice of
3  what Plaintiff must do to earn release, in violation
4  of the Fourteenth Amendment to the United States
5  Constitution.
6      157. The costs to Defendants of providing
7  such procedural safeguards would be minimal, and
8  any such costs are outweighed by the great risk
9  of erroneous deprivation of liberty that exists
10 under Defendants current policies and practices.
11     158. The policies and practices complained of
12 herein have been and continue to be implemented
13 by Defendants and its agents, officials, employees,
14 and all persons acting in concert under color of
15 state law, in their official capacity.
16
17         FOURTH CAUSE OF ACTION
18   (First Amendment - Correspondence and Publications)
19         42 U.S.C. § 1983
20
21     159. Plaintiff incorporates by reference each and
22 every allegation in the above paragraphs as if set forth
23 fully herein.
24     160. Defendants policies and practices of utilizing
25 overlybroad rules when rejecting Plaintiff's publication,
26 and allowing low level employees absolute discretion as to
27 what publication is rejected has resulted in
28 discrimination and prohibition of publications that are

1  not necessary to ensure the safety and security of
2  staff and other individuals.
3     161. Further, Defendants policies and practices
4  prevent Plaintiff from the ability to personally correspond
5  with family, and/or friends. Also, from corresponding
6  with his attorney, the Courts, and other legal professionals
7  (i.e., process servers, etc...)
8     162. Defendants policies and practices alleged
9  herein are not necessary to ensure the safety and
10 security of staff and other individuals. Defendants
11 policies and procedures are in violation of the First
12 Amendment to the United States Constitution.
13
14         FIFTH CAUSE OF ACTION
15 (Sixth Amendment - Interference with Right to Counsel)
16              42 U.S.C. § 1983
17
18    163. Plaintiff incorporates by reference each and every
19 allegation contained in the above paragraphs as if set
20 forth fully herein.
21    164. Defendants policies and practices prevent Plaintiff
22 from communicating by mail with his court appointed
23 attorney in relation to Plaintiff's pending criminal
24 matter. The policies and practices by Defendants as
25 alleged herein are in violation of the Sixth Amendment
26 to the United States Constitution.
27    165. The policies and practices complained of herein
28 have been and continue to be implemented by Defendants

1  and its agents, officials, employees, and all persons
2  acting in concert under color of state law, in their
3  official capacity.

4

5          SIXTH CAUSE OF ACTION
6         (Americans with Disabilities Act)
7    42 U.S.C. § 12132 and 28 C.F.R. § 35.152(b)(1)

8

9      166.  Plaintiff incorporates by reference each and
10  every allegation contained in the above paragraphs as
11  if set forth fully herein.
12      167.  By Defendants policies and practices of
13  discriminating against Plaintiff in regards to his
14  disabilities, Defendants violated the Americans with
15  Disabilities Act, 42 U.S.C. § 12132 and 28 C.F.R. §
16  35.152(b)(1) ("ADA").
17      168.  Defendant County is a public entity under
18  42 U.S.C. § 12131(1)(A).
19      169.  Plaintiff has physical, psychiatric, and thus
20  qualifies as an individual with disabilities. Plaintiff
21  has an impairment that substantially limits one or
22  more major life activities. Plaintiff has a record of
23  such impairment. Plaintiff meets the eligibility
24  requirements for the receipt of services and the
25  participation in programs or activities provided by
26  Defendants. 42 U.S.C. §§ 12102(2); 12131(2).
27      170.  Defendants violate the ADA by failing to
28  ensure that Plaintiff, who has disabilities, has access to,

1  and/or is permitted to participate in, and is not
2  denied the benefits of programs, services, and activities
3  provided by the Defendant, 42 U.S.C. § 12132; 28
4  C.F.R. § 35.152 (b)(1).
5      171. Defendant violates the ADA by failing to
6  make "reasonable modifications in policies, practices or
7  procedures when the modifications are necessary to
8  avoid discrimination on the basis of disability..." 28
9  C.F.R. § 35.130 (b)(7)(i).
10     172. Defendants violate the ADA by failing
11  to "ensure that inmates or detainees with
12  disabilities are housed in the most integrated setting
13  appropriate to the needs of the individuals."
14  28 C.F.R. § 35.152 (b)(2).
15     173. Defendants violate the ADA by failing to
16  "furnish appropriate auxiliary aids and services" where
17  necessary to afford individuals with disabilities... an
18  equal opportunity to participate in... a service, program,
19  or activity of a public entity." 28 C.F.R. 35.160(b)(1).
20     174. Defendants violate the ADA by failing to notify
21  people, including Plaintiff, about their rights under the
22  ADA while detained in the jails. 28 C.F.R. § 35.106.
23     175. Defendants violate the ADA by failing to "adopt
24  and publish grievance procedures providing for prompt
25  and equitable resolution of complaints alleging any
26  action that would be prohibited by...[the ADA]." 28
27  C.F.R. § 35.107 (b).
28     176. As a result of Defendants policies and procedures

regarding individuals with disabilities in the jails, Plaintiff is denied equal access to jail activities, programs and services for which he would otherwise have qualified.

## SEVENTH CAUSE OF ACTION
### (Section 504 of the Rehabilitation Act )
### 29 U.S.C. § 794

177. Plaintiff incorporates by reference each and every allegation contained in the above paragraphs as if set forth fully herein.

178. Plaintiff is a qualified individual with disabilities as defined in section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

179. Defendants received federal funding within the meaning of the Rehabilitation Act.

180. By Defendants policy and practice of discriminating against and failing to reasonably accommodate prisoners with disabilities, Defendants violate section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

181. As a result of Defendants discriminating against and failing to provide a grievance procedure and reasonable accommodations, Plaintiff does not have access to Jail activities, programs, and services for which he is otherwise qualified.
//

## EIGHTH CAUSE OF ACTION
### California Government Code § 11135

182. Plaintiff incorporates by reference each and every allegation contained in the above paragraphs as if set forth fully herein.

183. Defendant County receives financial assistance from the State of California as part of Realignment Legislation, California Government Code §§ 30025, 30026, and 30029, and through other statutes and funding mechanisms.

184. Plaintiff is a person with disabilities as defined by California Government Code § 11135.

185. Defendants deny plaintiff full access to the Jail's programs and activities which receive financial assistance from the State of California and unlawfully subject plaintiff to discrimination within the meaning of California Government Code § 11135(a) on the basis of his disabilities.

186. Plaintiff demands that Defendants stop unlawful discriminatory conduct described above, but Defendants refuse and still refuses to refrain from that conduct.

## PRAYER FOR RELIEF

187. Plaintiff has no adequate remedy at law to redress the wrongs suffered as set forth in this Complaint.

1  Plaintiff has suffered and will continue to suffer
2  irreparable injury as a result of the unlawful acts,
3  omissions, policies and practices of the Defendant as
4  alleged herein, unless Plaintiff is granted the relief
5  requested herein. The damages are severe. The need
6  for relief is critical because the rights at issue are
7  paramount under the Constitution of the United States,
8  the ADA, and section 504 of the Rehabilitation Act.
9      188. WHEREFORE, Plaintiff requests that the Court
10  grant the following relief:

11

12      a. Adjudge and declare that the conditions,
13  acts, omissions, policies and practices of
14  Defendants County and Scott Jones⑤, the agents,
15  officials, and employees are in violation of the
16  rights of Plaintiff under the First, Sixth, Eighth
17  and Fourteenth Amendments to the U.S.
18  Constitution, the ADA, and section 504 of the
19  Rehabilitation Act;
20      b. Enjoin Defendant County and Defendant
21  Scott Jones, the agents, officials, and
22  employees and all persons acting in concert
23  under the color of state law or otherwise,
24  from continuing the unlawful acts, conditions,
25  and practices described in this complaint;
26      c. Order Defendant County and Defendant
27  Scott Jones, the agents, officials, employees, and
28  all persons acting in concert under color of state

5) Unless otherwise specified, any references to Scott Jones are
to his individual and official capacity.

1  law or otherwise, to provide adequate mental
2  health, medical, dental care, including but not
3  limited to sufficient, timely, and confidential intake
4  Screening, triaging and responses to health care
5  requests, access to appropriate clinicians, prescription
6  and distribution of appropriate medications and
7  supplies, access to chronic care and specialty care,
8  access to adequate treatment, inpatient and
9  outpatient mental health treatment, suicide prevention,
10  and sufficient medical and mental health
11  staffing;
12     d. Order Defendant County and Defendant
13  Scott Jones, the agents, officials, employees, and
14  all persons acting in concert with them under
15  color of state law or otherwise, to develop and
16  implement, as soon as practical, a plan to
17  eliminate the substantial risk of serious harm that
18  Plaintiff suffers due to Defendants policy and
19  practice of locking people in their cells for 22
20  hours or more a day for prolonged or indefinite
21  periods of time, to end the harmful practice of
22  housing Plaintiff in solitary confinement conditions,
23  to ensure that people are not housed in restrictive
24  housing without a legitimate penological purpose,
25  and to provide a meaningful opportunity to be
26  heard and to challenge classification decisions
27  resulting in restrictive housing or other restrictive
28  placements;

e. Order Defendant County and Defendant Scott Jones, the agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to provide Plaintiff equal access to programs, services, and activities considering his disabilities, including but not limited to timely delivery of and appropriate access to assistive devices and medical supplies, housing people, including Plaintiff in the least restrictive and most integrated settings appropriate to their needs, providing an effective grievance system to contest disability discrimination, and notifying people with disabilities their rights under the ADA and section 504 of the Rehabilitation Act;

f. Order Defendant County and Defendant Scott Jones, the agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to provide Plaintiff a housing location where plaintiff may effectively socially distance, adequate clothing, proper ventilation, personal hygiene supplies, bedding and linens.

g. Order Defendant County and Defendant Scott Jones, the agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to provide plaintiff fresh air and a housing environment that is not overcrowded.

h. Order Defendant County and Defendant Scott Jones, the agents, officials, employees, and

1  all persons acting in concert under color of state
2  law or otherwise, to provide Plaintiff meaningful
3  access to the courts. A system to redress grievances
4  as to policies, procedures, practices, conditions of
5  Defendants and the jails. Additionally, to provide
6  Plaintiff the ability to pursue civil rights violations
7  and Habeas Corpus relief. Plaintiff is requesting this
8  court order Defendants assist inmates in the
9  preparation and filing of meaningful legal papers by
10 providing adequate law libraries or adequate assistance
11 from persons trained in the law. Further to provide
12 Plaintiff the ability to prosecute and/or defend civil
13 matters, bankruptcy, family law matters, and/or any
14 other legal matter Plaintiff may have an interest
15 in. Also, to allow Plaintiff to challenge and
16 defend against past and/or present charges against
17 him. Provide access to California Judicial Council forms, and
18 local forms.
19      i.  Order Defendant County and Defendant Scott
20 Jones, the agents, officials, employees, and all persons
21 acting in concert with them under color of state law
22 or otherwise, to provide plaintiff the ability to
23 communicate with his attorney in relation to
24 his criminal case (17FF006817).
25      j.  Order Defendant County and Defendant Scott
26 Jones, the agents, officials, employees, and all persons
27 acting in concert with them under color of state law
28 or otherwise, to create a policy that allows

inmates to receive publications and clearly identify any and all restrictions. That said restrictions comply with the Constitution.

K. Order Defendant County and Scott Jones, the agents, officials, employees, and all persons acting in concert under color of state law or otherwise, to create policies and practices that do not punish pre-trial inmates; especially, providing better treatment, clothing, housing facilities, food, and much more to pre-sentence detainees;

l. Order Defendant County and Defendant Scott Jones, in his official capacity, pay to / Plaintiff compensatory damages in the amount of $3,000,000.00 for actual losses, mental anguish humiliation, impairment of reputation and out of pocket losses.

m. Defendant County and Defendant Scott Jones, in his official capacity, acted with an evil motive and demonstrated reckless indifference to the constitutional rights of Plaintiff resulting in oppressive conduct. Therefore, this Court should award Plaintiff punitive damages in the amount of 9,000,000.00.

n. Award Plaintiff the costs of this suit and reasonable attorneys' fees and litigation expenses;

o. Retain jurisdiction of this case until Defendants have fully complied with the orders

of this Court, and there is reasonable assurance that Defendant will continue to comply in the future absent continuing jurisdiction;

p. Award such other and further relief as the Court deems just and proper.

Dated: October 29, 2020

Respectfully Submitted,

Shaun Smith, Plaintiff
In Pro Se

EXHIBIT A

# LAW LIBRARY REQUEST PROCEDURES

## THE LAW LIBRARY RESPONDS TO JUST ONE REQUEST PER INMATE EACH WEEK

YOU CAN REQUEST ACCESS TO THE LAW LIBRARY FOR RESEARCH, OR YOU CAN REQUEST INFORMATION THAT YOU NEED BE DELIVERED TO YOUR CELL BUT **NOT BOTH**

### ONCE YOU ARE ADDED TO THE LIST FOR ACCESS, OR YOUR REQUEST FOR INFORMATION IS FUFILLED NO ADDITIONAL REQUESTS WILL BE GRANTED FOR THAT WEEK

TO REQUEST COPIES OF LEGAL RESEARCH MATERIAL, FILL OUT AN INMATE REQUEST FORM AND ADDRESS IT TO LAW LIBRARY. BE SURE YOU PUT YOUR FULL NAME, X-REF, AND CORRECT HOUSING INFORMATION INCLUDING FLOOR, POD AND CELL #. INDICATE WHAT MATERIAL YOU ARE REQUESTING, OR INCLUDE ANY DOCUMENTS YOU NEED TO HAVE COPIED, IF YOUR REQUESTING PHYSICAL ACCESS TO THE LIBRARY, THEN WRITE THAT ON THE REQUEST IN THE MESSAGE SECTION

YOU MAY RECEIVE UP TO 25 PAGES PER WEEK FOR GENERAL POPULATION INMATES. IF YOUR CLASSIFICATION PREVENTS YOUR PHYSICAL ACCESS TO THE LIBRARY (T-SEP, AD-SEG) THEN YOU MAY RECEIVE UP TO 50 PAGES PER WEEK.

COPIES ARE LIMITED TO RESEARCH MATERIALS MAINTAINED IN THE LAW LIBRARY, AND/OR LEGAL DOCUMENTS PROVIDED BY YOU FOR COPYING

PLEASE INCLUDE BOTH THE WHITE AND YELLOW COPIES OF THE INMATE REQUEST FORM, AND ALLOW UP TO 7 DAYS FOR A RESPONSE

### ADDITIONAL NOTES:

➢ BE AS SPECIFIC AS POSSIBLE WITH REQUESTS (i.e. NAMES, CASE CITE, AND YEAR) (SEE EXAMPLES ON BACK OF THIS PAPER)

➢ SPECIFY WHAT CODE SECTIONS YOUR LOOKING FOR: PENAL, VEHICLE, EVIDENCE, HEALTH & SAFETY ETC.

➢ WE DON'T DO 1381 REQUESTS: TO FILE A 1381 REQUEST, USE INMATE REQUEST FORM ADDRESSED TO "COURT DESK" AND INCLUDE WHAT COUNTY YOUR FILING THE 1381 FOR

➢ CITIZEN COMPLAINT FORMS ARE NOT AVAILABLE FROM THE LAW LIBRARY. COMPLAINTS CAN BE MADE WITH A GRIEVANCE FORM OBTAINED FROM YOUR FLOOR OFFICER

➢ CIVIL FORMS (INCLUDING DIVORCE/MARRIAGE PACKETS) ARE NOT PROVIDED BY THE LAW LIBRARY

➢ WE DO HAVE 41500 FORMS; HOWEVER, YOU WILL NEED A PRISON # TO COMPLETE THEM (X-REF WILL NOT WORK)

➢ THE LAW LIBRARY CANNOT OFFER LEGAL ADVICE, ALL QUESTIONS ABOUT YOUR CASE SHOULD BE DIRECTED TO YOUR ATTORNEY

**SACRAMENTO COUNTY SHERIFF'S DEPARTMENT**

**COUNTY JAIL**
**MESSAGE REQUEST**

TO
☐ **LAW LIBRARY**
☐ FEDERAL PUBLIC DEFENDER   ☐ PUBLIC DEFENDER
☐ U.S. MARSHAL   ☐ SOCIAL WORKER   ☐ ICE   ☐ JAIL ADMIN. RECORDS   ☐ CHAPLAIN   ☐ PROBATION   ☐ RCCC

DATE: CURRENT DATE

RECEIVED BY OFFICER:

DATE:   TIME:

MESSAGE:

CAN I PLEASE GET THESE CASES: People v. McAlpin (1991) 53 Cal 3d; People v. Brown (2014) 53 Cal 4th; People v. Birks (1998) 19 Cal 4th 708; People v. Shutter (1936) 15 Cal 2d 704; People v. Cicero (1984) 157 Cal 3d 465; People v. Olsen (1984) 36 Cal 3d 638; In Re SMITH (1990) 220 Cal 3d 127 People v. Morales (1967) 254 Cal 2d 194; People v. Perkins (1982) 129 Cal 3d 15

FROM NAME:
YOUR NAME   X-REF NO.: YOUR X-REF   LOCATION: YOUR HOUSING

REPLY:

BY:

MJ 7431 FORM 022
REV 11/98

WHITE COPY FOR REPLY — YELLOW COPY TO RECORDS — PINK COPY KEPT BY INMATE

---

**SACRAMENTO COUNTY SHERIFF'S DEPARTMENT**

**COUNTY JAIL**
**MESSAGE REQUEST**

TO
☐ **LAW LIBRARY**
☐ FEDERAL PUBLIC DEFENDER   ☐ PUBLIC DEFENDER
☐ U.S. MARSHAL   ☐ SOCIAL WORKER   ☐ ICE   ☐ JAIL ADMIN. RECORDS   ☐ CHAPLAIN   ☐ PROBATION   ☐ RCCC

DATE: CURRENT DATE

RECEIVED BY OFFICER:

DATE:   TIME:

MESSAGE:

PLEASE PRINT CASE LAW: U.S. v. STOCKHEIMER, 157 F.3d 1082, 1091 (7th Cir 1998); U.S. v JACKSON, 346 F.3d 2 (2nd Cir 2003); U.S. v. ABITUNOFF, 1 F.3d 1112 (10th Cir 1993; U.S. v. GREGORIO, 956 F.2d 341, 344-348 (4th Cir 1992); U.S. v. GAUVIN, 173 F.3d 798 (10th Cir 1999); U.S. v. Milkowsky, 65 F.3d 4, 8 (2d Cir 1995).

FROM NAME:
YOUR NAME   X-REF NO.: YOUR X-REF   LOCATION: YOUR HOUSING

REPLY:

BY:

MJ 7431 FORM 022
REV 11/98

WHITE COPY FOR REPLY — YELLOW COPY TO RECORDS — PINK COPY KEPT BY INMATE

---

**BE SURE THAT YOU INCLUDE FULL CASE INFORMATION**

PROPERLY DONE FOR STATE CASES

PROPERLY DONE FOR FEDERAL CASES

and welfare at the same time if you are unsure of your eligibility, however you will not receive both. The Inmate Welfare Kit consists of a security toothbrush, toothpaste, deodorant, shampoo, two sheets of paper, two stamped envelopes, and small pencil. The cost of the kit will be charged to an inmate's account. In the future should an inmate receive money, they will be required to pay the full costs of the previously received welfare kits before they may purchase commissary.

Inmates at RCCC will utilize the Inmate Telephone System to place their order for an Indigent Kit; no bubble sheet will be accept except by those inmates who are unable to access the phone due to discipline or medical need (TTY). Specific instructions for the use of the Phone Ordering System are available in each of the housing units.

## C. iCARE

Sacramento County contracts with an outside vendor to allow friends and family of inmates to purchase care packages. These packages are called iCare. iCare packages may be ordered online at www.icaregift.com and typing "Sacramento County, CA" in the "Find your Facility" locator. iCare packages are delivered weekly with other ordered commissary items. iCare is included in the weekly commissary limit. Questions concerning the delivery of iCare packages should be handled by the person who ordered the package. The purchaser will need to contact iCare directly at 877-615-3296 with their order information.

WARNING: Any inmate that receives an iCare package that was purchased using a stolen credit will have their iCare privileges revoked permanently. Additionally, if you receive TouchPay deposits from a credit card that is later reported stolen, your account will be charged back for the fraudulent deposit and you will be required to repay the amount of the deposit prior to purchasing any commissary and your iCare privileges will also be permanently revoked. These policies are the policies of the vendors we do business with and are non-negotiable and non-grievable. **Please only accept iCare Packages from those individuals that you know and trust. You may refuse iCare packages if you are unfamiliar with the purchaser.**

**This is the only approved vendor website for friends and family to send you packages.**

## 10. LAW LIBRARY

**Main Jail Staffing Hours:** The Main Jail Law Library is staffed with a Law Librarian Monday through Friday, between the hours of 7:00 a.m. and 3:30 p.m.

Legal material shall be available during this time to inmates who wish to gather legal information pertinent to their current charges.

**Main Jail Law Library:** You may either request physical access to the Law Library, or you may request specific information pertaining to your current case(s) be delivered to your cell by submitting a Correctional Services Message Request addressed to the Law Library. Inmates may receive up to twenty-five (25) pages per week. If an inmate's classification prevents physical access the Law Library (i.e. Total Separation, Administrative Segregation, 400 Pod Discipline, etc.), he/she may receive up to fifty (50) pages. Copies are limited to the legal research materials maintained in the Law Library and/or copies of legal documents provided by the inmate.

**Main Jail Pro-Per Inmates:** Pro-Per inmates shall have priority in the use of the Main Jail Law Library. Thereafter, the balance of the requests from other inmates will be considered.

**Main Jail Rules of Conduct:** Inmates using the library shall be subject to the Jail Library regulations, and the established rules of inmate conduct. If an inmate breaches security or acts in an inappropriate manner, he/she will be immediately escorted back to his/ her housing unit, pending disciplinary action. Browsing privileges may be suspended.

**RCCC Law Library:** The law library is available to all inmates regardless of housing location or security classification. Inmates requesting to use the law library must send a kite to the law librarian. The law library consists of computer kiosks, which hold digital versions of required legal material. Inmates may use the law library kiosk for one hour per week and can request more time, which is subject to availability. Up to 25 copies of legal material may be requested per inmate per week. Inmates can request copies of legal material by sending a kite with the copies requested to the Law Librarian. A request for copies must include the specific case and case number. Inmates in discipline housing (full restriction) may request legal materials by listing the items needed on a kite and sending it to the law librarian.

## 11. SERVICES

### A. HEALTH SERVICES

**If you have a medical, dental, or psychiatric emergency, contact your housing floor officer.** Emergency services are available 24 hours a day 7 days a week

The Main Jail and RCCC are staffed with doctors, nurses, dentists, psychiatrists, and social workers available for your medical and mental health wellbeing. Medical doctors, psychiatrists, dentists, and nurses are licensed and regulated by their respective governing boards. If you were under the care of a medical professional

35

36

EXHIBIT B

Smith v. Superior Court of Sacramento County --- Cal.Rptr.3d ---- (2020)
Case 2:20-cv-02219-KJM-CKD   Document 1   Filed 11/05/20   Page 77 of 90
52 Cal.App.5th 57, 20 Cal. Daily Op. Serv. 7035, 2020 Daily Journal D.A.R. 7311

52 Cal.App.5th 57
Court of Appeal, Third District, California.

Shaun SMITH, Petitioner,

v.

The SUPERIOR COURT OF
SACRAMENTO COUNTY, Respondent;
The People, Real Party in Interest.

C088817
|
Filed 7/14/2020
|
As Modified 7/23/2020

**Synopsis**
**Background:** Petitioner, who was indigent defendant representing himself in pending criminal action, brought petition against the Superior Court, Sacramento County, for writ of mandate, prohibition, or other appropriate relief, contending that duties assigned to coordinator for self-represented defendants (pro. per. coordinator) constituted impermissible delegation of judicial powers.

**Holdings:** The Court of Appeal, Robie, J., held that:

[1] discretionary review of issue of delegation of judicial duties was warranted despite mootness;

[2] issue of whether trial court would provide adequate information to defendants in future was not ripe for review; and

[3] trial court's delegation of judicial duties to pro. per. coordinator violated separation of powers.

Petition granted.

West Headnotes (20)

**[1]    Evidence**  ⟜ Rules and procedure of courts

Court of Appeal would take judicial notice of trial court's policies and procedures applying to indigent in propria persona (pro. per.) defendants. Cal. Evid. Code § 452.

**[2]    Mandamus**  ⟜ Mandamus Ineffectual or Not Beneficial

The Court of Appeal may exercise its inherent discretion to decide otherwise moot issues if a petition for writ of mandate involves a matter of public interest and the issue is likely to recur and evade appellate review.

**[3]    Mandamus**  ⟜ Mandamus Ineffectual or Not Beneficial

On petition for writ of mandate, Court of Appeal would exercise its discretion to decide whether trial court's practice of assigning duties to process and approve requests for subpoenas and investigative and ancillary defense services sought by self-represented, indigent criminal defendants to in propria persona (pro. per.) coordinator violated separation of powers, even though trial court's appointment of counsel for petitioner in underlying criminal proceeding rendered petition moot; trial court's practices, procedures, and rules were matters of public concern impacting fundamental rights and access to courts, doctrine of separation of powers was constitutional cornerstone, and trial court continued to assign duties to pro. per. coordinator. Cal. Const. art. 3, § 3; Cal. Const. art. 6, § 1.

**[4]    Courts**  ⟜ Construction and application of rules in general

A superior court's practices, procedures, and rules are matters of public concern, impacting fundamental rights and access to the courts.

**[5]    Mandamus**  ⟜ Mandamus Ineffectual or Not Beneficial

Issue of whether trial court would provide adequate information about its procedures

Smith v. Superior Court of Sacramento County ___ Cal.Rptr.3d ___ (2020)
Case 2:20-cv-02219-KJM-CKD Document 1 Filed 11/05/20 Page 78 of 90
52 Cal.App.5th 57, 20 Cal. Daily Op. Serv. 7035, 2020 Daily Journal D.A.R. 7311

regarding in propria persona (pro. per.) coordinator to indigent, self-represented criminal defendants in future was not ripe for review on petition for writ of mandamus challenging procedures as violative of separation of powers; trial court's failure to indicate whether it would provide adequate information in future did not render its future course of conduct non-speculative. Cal. Const. art. 3, § 3; Cal. Const. art. 6, § 1.

**[6]** **Costs** ⬥ Expert witnesses or assistance in general

**Costs** ⬥ Investigative assistance

**Criminal Law** ⬥ Necessity and scope of proof

A defendant in a criminal proceeding has constitutionally protected rights to prepare his or her defense, including the right to investigative and ancillary defense services. U.S. Const. Amend. 6.

**[7]** **Costs** ⬥ Expert witnesses or assistance in general

**Costs** ⬥ Investigative assistance

**Criminal Law** ⬥ Experts and investigators

Although the statutes governing court-ordered expenses arising in connection with an indigent defendant's right to prepare his or her defense do not directly provide for court-ordered investigators, law clerks, or enumerated experts other than expert witnesses generally, the right to such services is to be inferred from the statutes respecting an indigent defendant's statutory right to legal assistance, and more fundamentally, such court-ordered defense services may be required in order to assure a defendant his constitutional right not only to counsel, but to the effective assistance of counsel. U.S. Const. Amend. 6; Cal. Gov't Code § 29603; Cal. Evid. Code §§ 730, 731(a).

**[8]** **Costs** ⬥ Production of Witnesses or Evidence

**Costs** ⬥ Investigative assistance

It is within the trial court's sound discretion to grant an indigent criminal defendant's request for investigative and ancillary defense services if the defendant has demonstrated the need for such services by reference to the general lines of inquiry he wishes to pursue, being as specific as possible.

**[9]** **Constitutional Law** ⬥ Encroachment on Judiciary

**Constitutional Law** ⬥ Encroachment on Judiciary

Executive and legislative officers cannot exercise or interfere with judicial powers. Cal. Const. art. 3, § 3; Cal. Const. art. 6, § 1.

**[10]** **Reference** ⬥ Findings of fact

**Reference** ⬥ Necessity for confirmation

Masters and referees perform subordinate judicial duties only if their findings and recommendations are advisory and not binding until adopted by the court.

**[11]** **Reference** ⬥ Findings of fact

**Reference** ⬥ Necessity for confirmation

A court independently must review a referee's proposed findings and conclusions.

**[12]** **Constitutional Law** ⬥ Encroachment in general

The focus in questions of separation of powers is the degree to which the governmental arrangements at issue comport with, or threaten to undermine, either the independence and integrity of one of the branches or levels of government, or the ability of each to fulfill its mission in checking the others so as to preserve the interdependence without which independence can become domination. Cal. Const. art. 3, § 3.

**[13]** **Costs** ⬥ Production of Witnesses or Evidence

Smith v. Superior Court of Sacramento County, --- Cal.Rptr.3d ---- (2020)
Case 2:20-cv-02219-KJM-CKD Document 1 Filed 11/05/20 Page 79 of 90
52 Cal.App.5th 57, 20 Cal. Daily Op. Serv. 7035, 2020 Daily Journal D.A.R. 7311

Civ. Proc. Code § 1985 et seq.; Cal. Penal Code § 1326 et seq.

**Witkin Library Reference:** 5 Witkin & Epstein, Cal. Criminal Law (4th ed. 2012) Criminal Trial, § 202 [Ancillary Defense Services; In General.]

ORIGINAL PROCEEDING in mandate. Petition granted. Patrick Marlette, Judge. (Super. Ct. No. 17FE006817)

**Attorneys and Law Firms**

Diane Nichols, San Diego, under appointment by the Court of Appeal, for Petitioner.

Duane Morris and Michael Louis Fox for Respondent.

Xavier Becerra, Attorney General of California, Michael P. Farrell, Senior Assistant Attorney General, Eric L. Christoffersen and John W. Powell, Deputy Attorneys General, for Real Party in Interest.

**Opinion**

Robie, Acting P. J.

**\*1** Petitioner Shaun Smith filed in this court, as an indigent defendant representing himself in propria persona (pro. per.) in a pending criminal action, a petition for writ of mandate, prohibition, or other appropriate relief (petition) against respondent Sacramento County Superior Court, challenging respondent's policies and procedures pertaining to pro. per. defendants then in effect. Petitioner's grievance lay in the duties respondent had assigned to the pro. per. coordinator -- an individual hired and supervised by, and subject to the control and direction of, Sacramento County (the county).

Respondent revised its policies and procedures pertaining to pro. per. defendants in response to our order to show cause, as further explained *post*; the revisions did not, however, quell petitioner's concerns pertaining to the pro. per. coordinator's continued role in the disposition of investigative and ancillary defense services requests and the review of subpoenas. And, rightfully so. When we consider the nature of those duties delegated to the pro. per. coordinator, as provided in respondent's revised policies and procedures, we conclude respondent has impermissibly delegated its judicial powers in contravention of the separation of powers clause of the California Constitution. We thus issue a writ of mandate

directing respondent to cease and desist from applying and implementing the pertinent portions of its revised pro. per. policies and procedures, and directing respondent to revise those policies and procedures in a manner consistent with this opinion.

**FACTUAL AND PROCEDURAL BACKGROUND**

In his verified petition, petitioner asserted: (1) he is a pro. per. defendant in a criminal matter; (2) he filed and respondent denied two ex parte applications for an order clarifying the role of the pro. per. coordinator; (3) he had been denied access to the court by being precluded from filing requests for ancillary services and other documents and instead being required to provide such documents to the pro. per. coordinator for filing; (4) documents petitioner provided to the pro. per. coordinator were not considered filed with the trial court, raising issues of timeliness as to filing; (5) when he did provide the pro. per. coordinator with documents for filing in the trial court, it took the pro. per. coordinator between one and three weeks to file some of the documents, while other documents were rejected by the pro. per. coordinator and returned to petitioner without explanation; and (6) he had not received several thousands of pages of redacted discovery.

Petitioner requested a stay in his criminal matter, an order providing he could file ancillary services requests and other documents directly with the trial court, and that his motions and requests would be adjudicated by a judicial officer. Petitioner further requested an order restraining respondent from prohibiting the filing of documents and ancillary services requests by indigent pro. per. defendants directly in the trial court and requiring those individuals to submit requests and documents to the pro. per. coordinator. Petitioner also requested an order compelling the pro. per. coordinator to provide him with the remaining discovery in his case and appointing an attorney to assist him in obtaining such discovery.

**\*2** This court appointed counsel for petitioner in this writ proceeding. We requested a preliminary opposition to the petition from respondent and directed it to include a discussion of the following four issues: (1) the scope of the pro. per. coordinator's responsibilities, including but not limited to, his or her role in deciding requests for ancillary services; (2) the legal authority pursuant to which the pro. per. coordinator operates, including but not limited to, the authority that permits him or her to decide requests for

Smith v. Superior Court of Sacramento County, ___ Cal.Rptr.3d ___ (2020)
Case 2:20-cv-02219-KJM-CKD   Document 1   Filed 11/05/20   Page 80 of 90
52 Cal.App.5th 57, 20 Cal. Daily Op. Serv. 7035, 2020 Daily Journal D.A.R. 7311

**Costs** 🡒 Investigative assistance

The review and consideration of an indigent criminal defendant's request for investigative and ancillary defense services are judicial duties. Cal. Const. art. 6, § 1.

[14]   **Costs** 🡒 Production of Witnesses or Evidence

When an indigent defendant requests defense services, the court must determine whether the defendant has demonstrated the need for such services by reference to the general lines of inquiry he or she wishes to pursue, being as specific as possible.

[15]   **Constitutional Law** 🡒 Delegation of Powers by Judiciary

**Counties** 🡒 Authority and Powers

Attorney who, as trial court's in propria persona (pro. per.) coordinator, processed and approved indigent, self-represented defendants' requests for investigative and ancillary defense services worked for county, not for court as a subordinate judicial officer, employee, or independent contractor, and, thus, trial court's delegation of judicial duties regarding defense services to pro. per. coordinator violated doctrine of separation of powers, where county hired coordinator, county conflict criminal defender's office was coordinator's sole supervisor, and coordinator was not appointed as subordinate judicial officer. Cal. Const. art. 3, § 3; Cal. Const. art. 6, § 1.

[16]   **Courts** 🡒 Ministerial officers in general

**Courts** 🡒 Power to regulate procedure

Courts have fundamental inherent equity, supervisory, and administrative powers, as well as inherent power to control litigation before them, including the power to hire staff to assist them in their operations, such as by appointing subordinate judicial officers to perform subordinate judicial duties. Cal. Const. art. 6, § 22.

[17]   **Courts** 🡒 Power to regulate procedure

**Judges** 🡒 Judicial powers and functions in general

Courts have a duty not only to dispense justice but also to maintain the integrity and impartiality of the judicial system.

[18]   **Constitutional Law** 🡒 Indigency

**Witnesses** 🡒 Right of Accused to Compulsory Process

An indigent defendant in a criminal case has a right, pursuant to the Due Process Clause, to the process of the court to compel the attendance of witnesses by subpoena, and the expenses of such witnesses are county charges. Cal. Const. art. 1, § 15; Cal. Civ. Proc. Code § 1985 et seq.; Cal. Penal Code § 1326 et seq.

[19]   **Witnesses** 🡒 Application and proceedings thereon

Whether a subpoena is procedurally deficient is a judicial question generally resolved through a motion to quash.

[20]   **Constitutional Law** 🡒 Delegation of Powers by Judiciary

**Counties** 🡒 Authority and Powers

**Courts** 🡒 Ministerial officers in general

Trial court's policy of requiring in propria persona (pro. per.) coordinator to review indigent, self-represented defendants' subpoenas for procedural correctness before subpoenas could be served by investigator impermissibly delegated judicial power; whether subpoenas were procedurally deficient was judicial question generally resolved through motion to quash, and pro. per. coordinator was not judicial employee, judicial independent contractor, or subordinate judicial officer, but, rather, was independent contractor hired by county and supervised by county conflict public defender's office. Cal. Const. art. 3, § 3; Cal. Const. art. 6, § 1; Cal.

**Smith v. Superior Court of Sacramento County, --- Cal.Rptr.3d ---- (2020)**
Case 2:20-cv-02219-KJM-CKD   Document 1   Filed 11/05/20   Page 81 of 90
52 Cal.App.5th 57, 20 Cal. Daily Op. Serv. 7035, 2020 Daily Journal D.A.R. 7311

ancillary services; (3) the protocols/procedures pro. pers. are required to follow when requesting ancillary services, obtaining discovery, and filing documents with the court; and (4) where such protocols and procedures can be found.

**[1]**  Respondent filed a preliminary opposition addressing only the foregoing four questions; it did not admit or deny the verified facts alleged in the petition. Respondent attached four documents as exhibits: (1) "Memorandum of Understanding Between the County of Sacramento and the Superior Court of California, Court of Sacramento" (memorandum of understanding); (2) "Sacramento Superior Court October 2006 Policies and Procedures for Pro Pers" (2006 pro. per. policies and procedures); (3) a memorandum to the county board of supervisors from Conflict Criminal Defenders for the agenda of November 7, 2006, with the subject, "Authorize A Retroactive Memorandum Of Understanding Between The County Of Sacramento And The Superior Court Of California, County Of Sacramento In Regards To Pro Per Coordination And Ancillary Services From August 1, 2006, Agreement With Donald Manning To Provide Pro Per Coordination From November 12, 2006, And Appropriation Request No. 27-012 In The Amount Of $95,104" (agenda memorandum); and (4) "Policy and Procedure for In-Custody In Pro Per Defendants & Investigators Assigned To In-Custody In Pro Per Defendant Cases."[1] (Underlining omitted.)

In describing the scope of the pro. per. coordinator's responsibilities, respondent wrote, "Sacramento County, through the Conflict Criminal Defender's [sic] office, provides to the Superior Court ongoing coordination of investigative and ancillary services for indigent pro per defendants, as delineated in the Policies and Procedures for Pro Pers." Respondent directed us to the memorandum of understanding, which provides, in pertinent part: the county will contract with an attorney to be the pro. per. coordinator; the county shall seek input from respondent but "retains ultimate responsibility for determining with whom to contract"; and the pro. per. coordinator will be "under the sole direction and supervision of the [county] Conflict Criminal Defender's [sic] Office." In return, respondent agreed to pay to the county the cost of the pro. per. coordinator's services because it was a court cost. The term of the memorandum of understanding is ongoing, from August 1, 2006, until terminated by either party upon 90 days' notice or by mutual agreement.

Respondent further quoted the following paragraph from the 2006 pro. per. policies and procedures in its preliminary opposition: "All [r]equests for ancillary services ... must be made in writing with sufficient detail to justify the need for the service. The investigator will receive the written requests from the defendant and deliver them to the Pro Per Coordinator. The Pro Per Coordinator will review each item, prepare a written response addressing each requested item and advising the defendant whether the item is approved, denied, modified, or that additional information is needed. The response shall include an advisement that the defendant may request a court review and modification of the Pro Per Coordinator's determination. [¶] A judicial officer may order that all or any requests for investigative or ancillary services be forwarded by the Pro Per Coordinator directly to the judicial officer for determination. When there is such an order, the Pro Per Coordinator shall also forward to the court a proposed determination prior to coordinating any investigative/ancillary services. The judicial officer's request for direct review of requests shall be entered into the minute order and will be transmitted by the courtroom clerk to the Pro Per Coordinator ... and to the defendant via the Law Librarian ...."

**\*3**  Respondent directed us to the agenda memorandum and the memorandum of understanding for the legal authority pursuant to which the pro. per. coordinator performs his or her duties. The agenda memorandum states the memorandum of understanding "is for Conflict Criminal Defenders to assume responsibility from [respondent] for coordination of requests for ancillary services by pro per defendants" and provides: "There is a benefit to both the Court and the County. The courts are relieved of the time consuming [sic] task of reviewing requests for ancillary services by pro per defendants. Conflict Criminal Defenders will receive compensation for providing this service to the Court and will be able to assure cost effective and responsible spending of tax payer's [sic] monies."

Because respondent did not address the allegations in the petition or discuss the adequacy or legality of its policies and procedures concerning the use of the pro. per. coordinator, this court ordered respondent to file a supplemental written response to the petition and directed it to include therein a discussion of: "(1) the allegations in the petition, including (a) pro per defendants in pending criminal actions are prohibited from filing any document directly with the trial court, (b) pro per defendants in pending criminal actions must submit all legal documents they intend to file with the trial court to

Case 2:20-cv-02219-KJM-CKD   Document 1   Filed 11/05/20   Page 82 of 90

the pro per coordinator, who then decides whether to file the documents or to reject and return them for being frivolous or overly long, (c) review by the pro per coordinator can result in one to three week delays in the filing of documents, and (d) petitioner has not received thousands of pages of discovery from the pro per coordinator; (2) the adequacy and legality of respondent's policies and procedures concerning the use of the pro per coordinator, including but not limited to, whether the pro per coordinator's adjudication of requests for ancillary services constitutes an improper delegation of judicial authority; (3) whether petitioner is entitled to have his [ancillary services] request for a real estate expert adjudicated by the trial court prior to trial; (4) why this case is not governed by our Supreme Court's decision in *Corenevsky v. Superior Court* (1984) 36 Cal.3d 307, 325-326 [204 Cal.Rptr. 165, 682 P.2d 360] [ (*Corenevsky*) ] [the trial court alone has authority to determine whether a defendant is entitled to ancillary services] and this court's decision in *Reaves v. Superior Court* (1971) 22 Cal.App.3d 587, 596 [99 Cal.Rptr. 156] [ (*Reaves*) ] [finding impermissible delegation of judicial authority where trial court reviewed orders drafted by district attorney]; and (5) petitioner's reply and documentation."[2/3]

Respondent filed a supplemental preliminary opposition. It disagreed with petitioner's allegations regarding the pro. per. coordinator's role, arguing: (1) the pro. per. coordinator assists with, but does not control, filings; (2) the pro. per. coordinator assists with ancillary requests, but does not finally adjudicate any requests; (3) pro. per. criminal defendants are not prohibited from filing any document directly with the trial court; (4) the pro. per. coordinator does not decide whether documents submitted to him or her for review are filed or not; (5) the pro. per. coordinator does not delay the filing of any documents by one to three weeks; and (6) petitioner had previously received all requested discovery.

**\*4** As to the pro. per. coordinator's review of investigative and ancillary defense services requests, respondent explained: "In order to obtain requested ancillary services at the County's expense, the defendant must show that the services requested are reasonably necessary to his defense. [Citation.] [Conflict Criminal Defenders] has responsibility to pay for the services and necessarily can provide approval without the need for the court's intervention, but to obtain [Conflict Criminal Defenders'] approval for expert services, a particularized showing is required in order that the appropriate expert service can be identified and provided. [Citation.] Here, Petitioner sought expert assistance with regard to the claims of real estate fraud. The Pro Per Coordinator

explained to Petitioner the specific information Petitioner needed to provide [to Conflict Criminal Defenders] if he wanted to successfully support his request for services. The information requested would both demonstrate that the service was reasonably necessary to the defense and inform [Conflict Criminal Defenders] of the particular expert assistance needed. [¶] While Petitioner objects to the Pro Per Coordinator's role in obtaining ancillary services, he is aided by the Pro Per Coordinator's involvement. If he submitted his request directly to the Superior Court in the first instance, and did not establish that the requested service was reasonably necessary to his defense, the Superior Court would not be in a position to advise him on how to strengthen that request. The likelihood that a defendant will be able to demonstrate that requested services are reasonably necessary increases with the aid of the Pro Per Coordinator." (Fn. omitted.)

According to respondent, the pro. per. coordinator had previously denied one of petitioner's requests for a real estate expert because petitioner's request did not comply with the Conflict Criminal Defenders' policies and procedures: "it was 'denied' by the Pro Per Coordinator in the context of advising what [Conflict Criminal Defenders] required, with the specific identification of what further information was needed, and the advisement that if re-submitted and approved by [Conflict Criminal Defenders], [Conflict Criminal Defenders] would appoint an expert."

Respondent further asserted its policies regarding and use of the pro. per. coordinator was an appropriate delegation of administrative duties, not an improper delegation of judicial authority. It predominantly relied on a provision allowing a pro. per. defendant to appeal the pro. per. coordinator's decisions to the court. It explained a defendant was "required to make his [or her] request [for ancillary services] in the first instance to the Pro Per Coordinator to facilitate pre-approval by [Conflict Criminal Defenders] pursuant to its policies and procedures," and, if "the County initially declines to provide a service, the Superior Court is available to adjudicate that request." In the event of such an adjudication by the court, "[the Conflict Criminal Defenders] rationale for its initial denial of any service -- communicated by the Pro Per Coordinator -- [would be] provided to the Superior Court." In this regard, respondent asserted *Corenevsky* and *Reaves* were relevant but not controlling. (*Corenevsky, supra,* 36 Cal.3d at p. 307, 204 Cal.Rptr. 165, 682 P.2d 360; *Reaves, supra,* 22 Cal.App.3d at p. 587, 99 Cal.Rptr. 156.)

Smith v. Superior Court of Sacramento County, --- Cal.Rptr.3d ---- (2020)
52 Cal.App.5th 57, 20 Cal. Daily Op. Serv. 7035, 2020 Daily Journal D.A.R. 7311

Case 2:20-cv-02219-KJM-CKD   Document 1   Filed 11/05/20   Page 83 of 90

Respondent also noted that it updated the 2006 pro. per. policies and procedures "to make clear within the procedures themselves that the services of the Pro Per Coordinator are to assist pro per defendants, and to make clear that the full access to the Superior Court is never impeded thereby," and updated a letter provided to pro. per. defendants to explain the pro. per. coordinator's role.

We issued an order to show cause why relief should not be granted, directing respondent, in discussing all of the issues presented, to address: (1) whether respondent's policy of requiring pro. per. criminal defendants to submit pleadings and subpoenas to the pro. per. coordinator for review prior to filing and/or service impermissibly restricts such defendants' access to the judicial process; (2) whether respondent's policy of requiring pro. per. defendants to submit requests for ancillary services to the pro. per. coordinator for decision in the first instance, as detailed in respondent's revised policies and procedures and described in the agenda memorandum, constitutes an impermissible delegation of judicial authority; and (3) whether respondent has changed its procedures related to pro. per. defendants following the filing of the petition (and if so, how) or simply clarified its written policies.

Respondent filed a return.[4] Therein, respondent stated it amended and clarified its 2006 pro. per. policies and procedures relating to the scope of the pro. per. coordinator's services. Respondent explained it clarified "that it is not a requirement that the Pro Per Coordinator review proposed filings prior to those documents being filed with the Superior Court, and that the Pro Per Coordinator reviews subpoenas for procedural correctness only, prior to service." Respondent further stated it "changed its policies with respect to the Pro Per Coordinator's review of ancillary services requests, providing that the Pro Per Coordinator will review each requested item and provide a recommendation for the Superior Court's consideration, and that the Superior Court will review each request and recommendation and issue a ruling." In that regard, if respondent required more information, it could set the matter for hearing.

**\*5** Respondent asserted the changes clarified pro. per. defendants have "full and unfettered access to the Superior Court" and made clear its "use of the Pro Per Coordinator does not impede access to the judicial process and does not amount to an impermissible delegation of judicial authority." Respondent attached two documents to the return: (1) "Policy and Procedure For Pro Per Defendants & Investigators Assigned to Their Cases," revised September

25, 2019 (revised pro. per. policies and procedure); and (2) "Sacramento Superior Court Internal Policies And Procedures For Pro Per Defendants," revised September 25, 2019 (revised internal pro. per. policies and procedures).[5]

Petitioner filed a reply.[6] Petitioner conceded the issues pertaining to the delay in providing him discovery and the denial of access to the courts (other than for investigative and ancillary defense services requests) are no longer in issue. He asserted, however, the following three issues remain: (1) respondent failed to explain why subpoenas requested by pro. per. defendants must be reviewed by the pro. per. coordinator for procedural correctness prior to service by the investigator; (2) the revised procedure pertaining to the investigative and ancillary services requests continues to constitute an impermissible delegation of judicial authority, denies, in part, access to the court, and deprives a pro. per. defendant of due process of law; and (3) respondent has failed to provide written policies and procedures sufficient to inform pro. per. defendants about respondent's procedures.

Petitioner attached to his reply a copy of the agenda memorandum and all attachments thereto, including the memorandum of understanding and the agreement for consulting services between the county and the pro. per. coordinator. The consulting agreement between the county and the pro. per. coordinator provides, in pertinent part, that the pro. per. coordinator's work product is the property of the county and the pro. per. coordinator "is subject to the control or direction of [the c]ounty as to the designation of tasks to be performed [and] the results to be accomplished by the services thereunder agreed to be rendered and performed." Exhibit A to the consulting agreement includes a description of services and provides, among other things: "Upon request of the [county], or upon order of the Court, the [pro. per. coordinator] shall, [through] Conflict Criminal Defenders, evaluate, approve, recommend and coordinate ancillary service requests for individuals charged with criminal conduct and representing themselves in the Superior Court of Sacramento County."

DISCUSSION

I

*Mootness*

Smith v. Superior Court of Sacramento County, --- Cal.Rptr.3d ---- (2020)
Case 2:20-cv-02219-KJM-CKD Document 1 Filed 11/05/20 Page 84 of 90
52 Cal.App.5th 57, 20 Cal. Daily Op. Serv. 7035, 2020 Daily Journal D.A.R. 7311

Respondent appointed trial counsel for petitioner after the petition was filed in this court. Respondent argues, and petitioner acknowledges, the change in petitioner's pro. per. status precludes this court from granting petitioner any effectual relief, rendering moot the issues presented in his petition. (*Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541, 63 Cal.Rptr. 21, 432 P.2d 717 [when an event occurs that renders it impossible for the court to grant effective relief, the court will dismiss an appeal].) Petitioner asserts, however, this court should consider, under the public interest exception to the mootness doctrine, the constitutional concerns raised by respondent's revised pro. per. policies and procedures pertaining to investigative and ancillary defense services requests and subpoena review and respondent's failure to provide sufficient written information regarding such policies and procedures to pro. per. defendants.

**\*6 [2]    [3]** As petitioner notes, we may exercise our inherent discretion to decide otherwise moot issues if a petition for writ of mandate involves a matter of public interest and the issue is likely to recur and evade appellate review. (*Californians for Fair Representation - No on 77 v. Superior Court* (2006) 138 Cal.App.4th 15, 22, 41 Cal.Rptr.3d 148.) We do so here and consider two of the three issues raised in the reply.

**[4]** A superior court's practices, procedures, and rules are matters of public concern, impacting fundamental rights and access to the courts. The concerns raised by the practices and procedures relating to the investigative and ancillary defense services requests and subpoena review implicate a constitutional cornerstone of our democracy -- the separation of powers between the legislative, executive, and judicial branches of government. Given the gravity of the public interest at stake and the continued delegation of duties to the pro. per. coordinator, we exercise our inherent authority to decide the controversy.

**[5]** We decline, however, to consider whether respondent will provide adequate information regarding its policies and procedures to pro. per. defendants in the future. The crux of petitioner's argument is that respondent has failed to indicate whether it will provide both the revised pro. per. policies and procedures and the revised internal pro. per. policies and procedures to pro. per. defendants. He hypothesizes respondent may intend to provide only the revised pro. per. policies and procedures, in which case "a number of problems" may arise. We decline to consider

unripe hypothetical and speculative future actions respondent may or may not take.

II

*Investigative and Ancillary Defense Services Requests*

A

*Legal Background*

**[6]** A defendant in a criminal proceeding has constitutionally protected rights to prepare his or her defense, including the right to investigative and ancillary defense services. (*Corenevsky, supra*, 36 Cal.3d at pp. 319-320, 204 Cal.Rptr. 165, 682 P.2d 360 [the constitutional right to investigative and ancillary defense services is "a necessary corollary of the right to effective assistance of counsel"].) "Evidence Code section 730 explicitly provides for court-appointed expert witnesses, and ... Evidence Code section 731, subdivision (a), and Government Code section 29603 clearly state that the county must pay those court-ordered expenses." (*Corenevsky*, at pp. 318-319, 204 Cal.Rptr. 165, 682 P.2d 360, fns. omitted; *People v. Worthy* (1980) 109 Cal.App.3d 514, 520, 167 Cal.Rptr. 402 ["If a criminal defendant requires the services of investigators or scientific or medical experts to assist him in preparation of his defense, that assistance must be provided. Whether it is paid for by the government or by the defendant depends solely on the defendant's economic status"].)

**[7]    [8]** Although the foregoing statutes "do not directly provide for court-ordered investigators, law clerks, or enumerated experts other than expert witnesses generally," "the right to such services is to be inferred from at least two statutes respecting an indigent defendant's statutory right to legal assistance; and more fundamentally, such court-ordered defense services may be required in order to assure a defendant his constitutional right not only to counsel, but to the effective assistance of counsel." (*Corenevsky, supra*, 36 Cal.3d at p. 319, 204 Cal.Rptr. 165, 682 P.2d 360, fn. omitted.) It is within the trial court's sound discretion to grant a criminal defendant's request for investigative and ancillary defense services "if [the defendant] has demonstrated the need for such services by reference to ' "the general lines of inquiry he wishes to pursue, being as specific as possible." ' " (*Id.* at p. 320, 204 Cal.Rptr. 165, 682 P.2d 360; see *Torres v. Municipal Court* (1975) 50 Cal.App.3d 778, 784, 123 Cal.Rptr. 553.)

**Smith v. Superior Court of Sacramento County, --- Cal.Rptr.3d ---- (2020)**
Case 2:20-cv-02219-KJM-CKD   Document 1   Filed 11/05/20   Page 85 of 90
52 Cal.App.5th 57, 20 Cal. Daily Op. Serv. 7035, 2020 Daily Journal D.A.R. 7311

of the state in our Supreme Court, the courts of appeal, and the
superior courts. (Cal. Const., art. VI, § 1.) Thus, executive and
legislative officers cannot exercise or interfere with judicial
powers.

**[10]  [11]**  "The California Constitution [further] imposes
limitations upon the power of nonjudicial officers [ (e.g.,
special masters, commissioners, and referees) ] to exercise
judicial functions." (*People v. Superior Court (Laff)* (2001)
25 Cal.4th 703, 721, 107 Cal.Rptr.2d 323, 23 P.3d 563; Cal.
Const., art. VI, § 22 ["[t]he Legislature may provide for
the appointment by trial courts of record of officers such
as commissioners to perform subordinate judicial duties"].)
Subordinate judicial officers are appointed by order of the
trial court, serve at the pleasure of the trial court, and are
subject to rules pertaining to minimum qualifications and
training requirements promulgated by the Judicial Council.
(Gov. Code, § 71622, subds. (a)-(c); see Cal. Rules of Court,
rule 10.701 [qualifications and education of subordinate
judicial officers].) "Masters and referees perform subordinate
judicial duties only if their findings and recommendations
are advisory and not binding until adopted by the court.
[Citations.] The court independently must review the referee's
proposed findings and conclusions." (*Laff*, at p. 721, 107
Cal.Rptr.2d 323, 23 P.3d 563.)

**[12]**  "The focus in questions of separation of powers is 'the
degree to which [the] governmental arrangements comport
with, or threaten to undermine, either the *independence and
integrity* of one of the branches or levels of government, or the
ability of each to fulfill its mission in checking the others so as
to preserve the *interdependence* without which independence
can become domination.' " (*City of Sacramento v. California
State Legislature* (1986) 187 Cal.App.3d 393, 398-399, 231
Cal.Rptr. 686.)

Our Supreme Court in *Corenevsky* discussed the delineation
of responsibilities between local governments and the
judiciary pertaining to investigative and ancillary defense
services requests. (*Corenevsky, supra,* 36 Cal.3d at p. 307,
204 Cal.Rptr. 165, 682 P.2d 360.) In that case, the county
auditor declined to disburse funds to pay for "court-ordered
[investigative and ancillary defense] services unless there
existed sufficient allocated monies in an appropriate account
in the county budget." (*Id.* at pp. 323-324, 204 Cal.Rptr. 165,
682 P.2d 360.) Our Supreme Court considered "what role
the board of supervisors, and hence the auditor, may play in
regard to court-ordered defense services." (*Id.* at p. 325, 204
Cal.Rptr. 165, 682 P.2d 360.) The answer was unequivocal --

**B**

*The Revised Investigative And Ancillary Defense Services
Request Procedure*

**\*7**  The revised pro. per. policies and procedures provide:
"All requests for investigative and ancillary services must
be made in writing with sufficient detail to justify the need
for the service. The investigator will receive the written
requests from the defendant and deliver them to the Pro Per
Coordinator. The Pro Per Coordinator will review each item
and provide a recommendation for the Court's consideration.
[¶] The Pro Per Coordinator's recommendation to the Court
shall include the reasons for the recommendation and a copy
of the pro per defendant's written request. The Court will
review the request and recommendation and issue a ruling.
If more information is needed, the Court may set the matter
for hearing. [¶] Upon receipt of the Court's order or at the
conclusion of a hearing, if the Court so orders, the Pro
Per Coordinator shall coordinate any approved investigative/
ancillary services."

**C**

*Analysis*

Petitioner maintains the revised procedure pertaining to
the pro. per. coordinator's review of and recommendation
regarding a pro. per. defendant's request for investigative and/
or ancillary defense services remains an improper delegation
of judicial power, denies him, in part, direct access to the
court, and deprives him of due process of law. We agree the
duties delegated to the pro. per. coordinator in that regard
constitute an impermissible delegation of judicial authority,
as provided in *Corenevsky* and *Reaves*. (*Corenevsky, supra,*
36 Cal.3d at p. 307, 204 Cal.Rptr. 165, 682 P.2d 360; *Reaves,
supra,* 22 Cal.App.3d at p. 587, 99 Cal.Rptr. 156.) We,
therefore, do not consider petitioner's remaining contentions.

**[9]**  The separation of powers clause in the California
Constitution provides: "The powers of state government are
legislative, executive, and judicial. Persons charged with the
exercise of one power may not exercise either of the others
except as permitted by th[e] Constitution." (Cal. Const., art.
III, § 3.) The California Constitution vests the judicial power

the trial court alone has the authority to determine whether a defendant has shown a reasonable need for defense services and the county is powerless to review such requests, or to modify or veto the court's determination. (*Ibid.*) "To hold otherwise would be to encourage and facilitate local government intrusion into exclusive powers of the judiciary" because "it is solely a judicial question whether a given defendant shall be afforded requested defense services." (*Id.* at p. 326, 204 Cal.Rptr. 165, 682 P.2d 360.)

*8 The second pertinent separation of powers case was issued by this court almost a half century ago. In *Reaves*, this court concluded a superior court's procedures governing the review and disposition of extraordinary writs violated the California Constitution's provision against the delegation of judicial functions. (*Reaves, supra*, 22 Cal.App.3d at pp. 590–591, 596, 99 Cal.Rptr. 156.) The procedures at issue in that case provided: "After the filing of the petition for a writ, it is reviewed by the judge presiding in the criminal department and is then forwarded to the district attorney's office so that any factual information can be verified, or if any additional factual information is necessary, that information can be obtained. The district attorney's office is then requested to prepare a proposed order based upon the factual information contained in the petition or obtained as a result of their inquiries. This is done in a majority of the cases. If the petition presents an unusual factual situation, these matters are brought to the attention of the presiding judge of the criminal department, who reviews the entire matter and then directs the district attorney's office to prepare a specified order. In those matters where the district attorney's office submits a proposed order, the judge reviews such order and the order is either signed as submitted or signed as modified. In some instances the court will prepare the order itself. The assigned district attorney usually discusses the results of his [or her] investigation with the judge at the time of submitting the file unless the proposed order is a routine matter where the information in the prepared order is self-explanatory." (*Id.* at pp. 590–591, 99 Cal.Rptr. 156.)

Essentially, the district attorney was the sole source of information and facts presented to the superior court, obtaining the needed information to review a particular petition from the various correctional authorities and then drafting the order for the court's consideration. (*Reaves, supra*, 22 Cal.App.3d at p. 596, 99 Cal.Rptr. 156.) The prison inmates argued, among other things, the superior court had in effect abdicated its responsibility to determine both the facts and the law, and had transferred its judicial responsibility to an officer who stood in an adverse position to the them. (*Id.* at p. 593, 99 Cal.Rptr. 156.) The superior court asserted the procedure was proper and commendatory, in line with its fundamental power to implement procedures not specified by statute, and appropriate given "the procedure it ha[d] adopted resolve[d] one of the most vexing problems confronting the courts, i.e., how to secure a sufficient investigation of the claims in order to determine whether the petition contains possible meritorious matters, or is merely false, sham or frivolous." (*Id.* at pp. 594–595, 99 Cal.Rptr. 156.) The superior court further maintained its procedure did not constitute a delegation of judicial duties because a judge independently exercised its discretion in determining whether to grant or deny a petition for extraordinary writ. (*Id.* at p. 595, 99 Cal.Rptr. 156.)

This court concluded the superior court's practice was an impermissible delegation of the judicial function, explaining: "when the district attorney reviews a particular petition at the superior court's request, obtains the needed information from the various correction authorities himself, and then drafts the order, ... [it] results in an improper delegation of the judicial function." (*Reaves, supra*, 22 Cal.App.3d at p. 596, 99 Cal.Rptr. 156.) Recognizing "superior court judges are not always provided with sufficient clerical or investigative staffs" and "inequities among the various counties exist since some counties are overloaded merely because they have a prison or prisons located within their boundaries," this court set forth the following proposed guidelines: "The [superior] court should review each petition individually. If the petition is patently frivolous or lacking in merit on its face, it can be summarily denied. If the trial court records or prison documents or appellate opinions are needed, the court can instruct the clerk to obtain verified copies of the same. Should the court deem it necessary to formulate an order with its reasons for an order to show cause or a denial, it should do so." (*Ibid.*)

As explained *ante*, we directed respondent to consider *Corenevsky* and *Reaves* before we issued the order to show cause. Respondent believes the revised investigative and ancillary services requests procedure does not constitute an impermissible delegation of judicial powers because the court receives input from both the pro. per. defendant and the pro. per. coordinator regarding the requested service and then independently determines whether such service will be provided. Respondent further attempts to distinguish the pro. per. coordinator's role from the district attorney's role in *Reaves*, asserting the pro. per. coordinator functions as the

clerk required by *Reaves* and emphasizing the court receives the factual information submitted by the pro. per. defendant (thus not relying solely on factual information submitted by the pro. per. coordinator) and the pro. per. coordinator does not draft the order approving or denying requests. In respondent's view, the pro. per. coordinator "is a sworn clerk of the Superior Court and an experienced attorney who is working under the direct supervision of, and serving at the pleasure of, the Superior Court." Respondent refers us to *People v. Superior Court (Laff)*, *supra*, 25 Cal.4th at page 721, 107 Cal.Rptr.2d 323, 23 P.3d 563, relating to the use of special masters and referees in judicial proceedings, and California Code of Judicial Ethics, canon 3B(7)(a), which provides, "[a] judge may consult with court personnel or others authorized by law, as long as the communication relates to that person's duty to aid the judge in carrying out the judge's adjudicative responsibilities."

**\*9** We analyze the issue in two steps. First, we consider whether the pro. per. coordinator performs judicial functions in reviewing, considering, and making a recommendation regarding the resolution of investigative and ancillary defense services requests. The answer is, yes. We next consider whether the pro. per. coordinator is an officer, employee, or independent contractor of the court. The answer is, no; the pro. per. coordinator is a local government independent contractor. We thus conclude the pro. per. coordinator's role in the disposition of requests for investigative and ancillary defense services constitutes an improper invasion into the province of the judiciary, violating the separation of powers clause.[7]

**[13]  [14]** The review and consideration of a defendant's request for investigative and ancillary defense services are unquestionably judicial duties.[8] Our Supreme Court has unequivocally spoken on this issue -- "it is solely a judicial question whether a given defendant shall be afforded requested defense services." (*Corenevsky*, *supra*, 36 Cal.3d at p. 326, 204 Cal.Rptr. 165, 682 P.2d 360.) The court must determine whether the defendant has demonstrated the need for such services by reference to " ' "the general lines of inquiry he wishes to pursue, being as specific as possible." ' " (*Id.* at p. 320, 204 Cal.Rptr. 165, 682 P.2d 360.)

**[15]** Turning to whether the pro. per. coordinator may discharge such duties, we consider the nature of the pro. per. coordinator's employment and his or her relationship with respondent and the county. We initially note respondent's assertions that the pro. per. coordinator is a "sworn clerk" of

the court and "working under the direct supervision of, and serving at the pleasure of," the court are *unsupported by any evidence*. We do not consider such statements in the absence of a declaration or verification.[9] (*Hall v. Superior Court* (2005) 133 Cal.App.4th 908, 914, 35 Cal.Rptr.3d 206; *People v. Superior Court (Alvarado)* (1989) 207 Cal.App.3d 464, 470, 255 Cal.Rptr. 46.) Moreover, respondent's assertions are at odds with the position taken in its supplemental preliminary opposition and belied by the memorandum of understanding and the agreement between the pro. per. coordinator and the county. Respondent's attempt to pivot in its characterization of the pro. per. coordinator's role is troubling.

In its supplemental preliminary opposition, respondent asserted and explained the pro. per. coordinator applies *Conflict Criminal Defenders'* policies and procedures in reviewing and evaluating a pro. per. defendant's request for investigative and ancillary defense services and equated the pro. per. coordinator's determination to deny a request with *the county* declining to provide the service. This comports with the county's view, as stated in the agenda memorandum, that respondent's delegation of those duties to the pro. per. coordinator would allow the county "to assure cost effective and responsible spending of tax payer's [*sic*] monies."

**\*10** The memorandum of understanding, to which respondent is a party, further provides the county selects the pro. per. coordinator and the individual will be "under the sole direction and supervision of the Conflict Criminal Defender's [*sic*] Office." The agreement between the pro. per. coordinator and the county is consistent with this understanding, providing the pro. per. coordinator is subject to the control and direction of the county as to the designation of tasks to be performed and the results to be accomplished by the services rendered. This evidence directly contradicts respondent's unsupported assertions the pro. per. coordinator serves under its supervision as a court clerk.

**[16]  [17]** We also do not find respondent's reference to its authority to consult with court personnel or others authorized by law and to appoint subordinate judicial officers applicable to the pro. per. coordinator's role. It is, of course, axiomatic that " 'courts have fundamental inherent equity, supervisory, and administrative powers, as well as inherent power to control litigation before them' " (*People v. Rodriguez* (2016) 1 Cal.5th 676, 682, 206 Cal.Rptr.3d 588, 377 P.3d 832), including the power "to hire staff to assist it in its operations," such as appointing subordinate judicial officers to perform subordinate judicial duties (*People v. Superior Court (Laff)*,

**Smith v. Superior Court of Sacramento County, Cal.Rptr.3d ---- (2020)**
Case 2:20-cv-02219-KJM-KJN   Document 1   Filed 11/05/20   Page 88 of 90
52 Cal.App.5th 57, 20 Cal. Daily Op. Serv. 7035, 2020 Daily Journal D.A.R. 7311

*supra*, 25 Cal.4th at p. 735, 107 Cal.Rptr.2d 323, 23 P.3d 563). But, the pro. per. coordinator is not appointed as a subordinate judicial officer and is not an employee or independent contractor of the court. The pro. per. coordinator may not, therefore, perform judicial duties.

Courts have a duty not only to dispense justice but also to maintain the integrity and impartiality of the judicial system. (*DeJung v. Superior Court* (2008) 169 Cal.App.4th 533, 548, 87 Cal.Rptr.3d 99 ["the core governmental responsibility entrusted to the courts [is] to provide for a public justice system that is unfailingly unbiased and impartial"].) The delegation of judicial duties to the pro. per. coordinator undermines the independence and integrity of the judicial branch by "encourag[ing] and facilitat[ing] local government intrusion into exclusive powers of the judiciary," and thus violates the separation of powers doctrine. (*Corenevsky*, *supra*, 36 Cal.3d at p. 326, 204 Cal.Rptr. 165, 682 P.2d 360.)

III

*Subpoena Review*

[18] "It is fundamental that a defendant in a criminal case has a right to the process of the court to compel the attendance of witnesses [by subpoena] [citations] and that the expenses of such witnesses are county charges." (*People v. Stone* (1965) 239 Cal.App.2d 14, 21, 48 Cal.Rptr. 469.) "The right of a defendant in a criminal proceeding to the use of the subpoena [and/or] subpoena duces tecum[ ] to compel production of witnesses [and/or] documents is grounded upon due process rights found in the California Constitution, article I, section 15. The means of implementation of the constitutional rights, the production of such evidence, is detailed in section 1985 et seq. of the Code of Civil Procedure and section 1326 et seq. of the Penal Code." (*People v. York* (1980) 108 Cal.App.3d 779, 790, 166 Cal.Rptr. 717.)

Respondent's revised pro. per. policies and procedures provide investigators shall "[h]ave the Pro Per Coordinator review, for procedural correctness only, subpoenas prepared by the pro per defendant, prior to service by the investigator." Respondent believes this requirement presents "no actual or apparent restriction on defendants' access to the judicial process" because the policy "does not require pro per criminal defendants to submit documents to the pro per coordinator prior to filing." It also asserts "the Pro Per Coordinator's review of subpoenas, for procedural correctness only, does

not impermissibly restrict access to the judicial process" but, rather, permissibly "supports the Court's interest in the orderly administration of judicial business" because "a subpoena represents an action of the Superior Court."

**\*11** Petitioner disagrees. He refers us to Penal Code section 1326, subdivision (a)(4), which provides a defendant's attorney of record is authorized to sign and issue a subpoena in criminal cases. He contends respondent "offers no sound justification for why a defendant who is representing himself must have a subpoena screened when his attorney does not, other than the review for procedural correctness" based on the court's interest in the orderly administration of justice. Petitioner asserts "[a]ny procedural deficits would be to the defendant's detriment, not the court's." And, the policy does not allow a defendant "to protect himself against unreasonable delays by the Pro Per Coordinator."

We do not find Penal Code section 1326 pertinent to the issue at hand. Respondent's revised procedure does not implicate the signing and issuance of a subpoena but instead imposes a barrier to the *service* of a subpoena by providing the pro. per. coordinator must review the subpoena before it may be served by the investigator. We, however, conclude the subpoena review procedure constitutes an impermissible delegation of judicial power.

[19] [20] Whether a subpoena is procedurally deficient is a judicial question generally resolved through a motion to quash. (See *People v. Superior Court (Humberto S.)* (2008) 43 Cal.4th 737, 743, 76 Cal.Rptr.3d 276, 182 P.3d 600.) The delegation to the pro. per. coordinator -- a county independent contractor -- the determination whether a subpoena is procedurally deficient thus violates the separation of powers clause, as explained *ante*.[10]

DISPOSITION

Let a peremptory writ of mandate issue: (1) directing respondent to cease and desist from applying and implementing the revised pro. per. policies and procedures pertaining to the investigative and ancillary services requests and subpoena review procedures outlined herein; and (2) further directing respondent to revise those policies and procedures in a manner consistent with this opinion.

Smith v. Superior Court of Sacramento County, --- Cal.Rptr.3d ---- (2020)
Case 2:20-cv-02219-KJM-CKD Document 1 Filed 11/05/20 Page 89 of 90
52 Cal.App.5th 57, 20 Cal. Daily Op. Serv. 7035, 2020 Daily Journal D.A.R. 7311

We concur:

Mauro, J.

Butz, J.[*]

**All Citations**

--- Cal.Rptr.3d ----, 52 Cal.App.5th 57, 2020 WL 3969908, 20 Cal. Daily Op. Serv. 7035, 2020 Daily Journal D.A.R. 7311

**Footnotes**

1       We treat respondent's submittal of the 2006 pro. per. policies and procedures as an implied request for judicial notice and take judicial notice thereof under Evidence Code section 459 as a matter that could be judicially noticed under Evidence Code section 452. The parties were given "a reasonable opportunity to meet such information" (Evid. Code, § 459, subd. (d)) and "to present information relevant to (1) the propriety of taking judicial notice of the matter and (2) the tenor of the matter to be noticed" (Evid. Code, §§ 459, subd. (c), 455, subd. (a)). The other three exhibits were attached to petitioner's verified briefs.

2       Petitioner attached a declaration and various exhibits to his reply to respondent's preliminary opposition to the petition. We elected to treat petitioner's reply, including the supporting documentation, as a supplement to the petition.

3       We also ordered the People to file a supplemental written response. The People complied with the order. We do not discuss the People's position because it is not pertinent to the disposition in this matter, as explained *post*.

4       In the order to show cause, we provided that the People, as real party in interest, could respond to the return. The People, however, took no position on the issues addressed in the return, stating they were no longer adverse to the matter and have no actual interest in the issues addressed in the return.

5       We treat respondent's submittal of these exhibits as an implied request for judicial notice and take judicial notice thereof under Evidence Code section 459 as a matter that could be judicially noticed under Evidence Code section 452. The parties were given "a reasonable opportunity to meet such information" (Evid. Code, § 459, subd. (d)) and "to present to the court information relevant to (1) the propriety of taking judicial notice of the matter and (2) the tenor of the matter to be noticed" (Evid. Code, §§ 459, subd. (c), 455, subd. (a)).

6       Petitioner's counsel submitted a verification on behalf of petitioner, declaring she had read the reply and had reviewed the exhibits, and knew the contents to be true.

7       We requested supplemental briefing from the parties as to whether the procedure violates due process and equal protection principles. In light of our disposition of the issue, we do not decide whether the procedure passes constitutional muster in that regard.

8       Respondent seemingly agrees the pro. per. coordinator's duties in this regard are judicial in nature; it does not argue otherwise and instead analogizes the pro. per. coordinator's role to the judicial clerk's function described in *Reaves* and refers us to a court's authority to use special masters and referees in judicial proceedings and to consult with court personnel and others when carrying out judicial adjudicative responsibilities.

9       For this same reason we disregard respondent's statements that in excess of 90 percent of the requests received by the pro. per. coordinator are approved, "the Pro Per Coordinator has no communication with the County with regard to particular requests made," and "[t]he County's only role is to arrange and pay for ancillary services recommended by the Pro Per Coordinator and ordered by the Superior Court."

10      We requested supplemental briefing from the parties as to whether the procedure violates due process and equal protection principles. In light of our disposition of the issue, we do not decide whether the procedure passes constitutional muster in that regard.

*       Retired Associate Justice of the Court of Appeal, Third Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

---

**End of Document**

© 2020 Thomson Reuters. No claim to original U.S. Government Works.

Shaun Smith
RCCC
12500 Bruceville Road
Elk Grove, CA 95757

October 30, 2020

*FYI*
*Some attachments/Exhibits are double sided*

Clerk of the U.S District Court
for the Eastern District of California
501 I Street
Room 4-200
Sacramento, CA 95814

Re: Smith v. County of Sacrament, et al.
Case NO. TBD

Dear Clerk of the Court:

I am an inmate being held at the Rio Cosumnes Correctional Center, I am indigent. The Sheriff of Sacramento County has policies and practices in place preventing copies exceeding 25 pages (See Complaint provided herewith, Exhibit A). Unfortunately that is one of the issues I am addressing in my Complaint provided herewith.

The 25 page limitation is preventing me from providing more than the original copy of my In Forma Pauperis Application and Civil Rights Complaint. Can you please provide me a filed/endorsed copy of the enclosed documents?

Additionally, I am not provided any access to available federal forms and these are the only two forms provided by the Sheriff.

Thank you so much for your time and attention.

Sincerely,

Shaun Smith